Opinion by Justice Rodriguez
In prosecutions for capital murder, first-degree felony aggravated sexual assault, and first-degree felony burglary of a habitation with intent to commit a robbery, appellant Isaiah Cardenas, who was younger than eighteen years old at the time of the offenses, appeals from an order setting his pretrial bond. By two issues, Cardenas contends: (1) the trial court abused its discretion in setting his pretrial bond at $750,000; and (2) the trial court improperly considered hearsay evidence. We affirm.
I. BACKGROUND
A. Arrest Warrant
On June 13, 2017, an arrest warrant issued for Cardenas on charges of capital murder, aggravated sexual assault, and burglary of a habitation with intent to commit assault or other felony, all arising out of the same incident alleged to have been committed on or about June 11, 2017.[1] The warrant set Cardenas's bond at "No Bond" for all offenses.
On July 11, 2017, Cardenas filed an application for a writ of habeas corpus, asserting there was no probable cause for his detention. Cardenas requested that he be released pending trial on "reasonable bond."
B. July 26, 2017 Bond Hearing
1. Cardenas Requested a $75,000 Bond; the State Requested No Bond or, Alternatively, a $750,000 Bond for Each Case
On July 26, 2017, the trial court heard Cardenas's bond application.[2] Cardenas requested his bond be set at $75,000. He did not request or recommend that any special conditions be placed on his bond.
The State requested that bond be continued at no bond, but in the alternative, if the trial court determined that Cardenas was to receive bail, the State requested that the trial court set a $750,000 bond for each of Cardenas's cases. Like Cardenas, the State did not request that any conditions be set on Cardenas's bond.
2. Evidence at the Hearing *726 a. Rita Martinez, Cardenas's Mother
Cardenas's mother, Rita Martinez, testified for the defense. She confirmed that Cardenas was a United States citizen and a lifelong resident of Victoria, Texas, the jurisdiction in which he is charged. She also established that Cardenas was seventeen years old at the time of the offense. Martinez and Cardenas's father had divorced more than four years earlier. Cardenas's father, siblings, and extended family lived in Victoria. Martinez explained that although Cardenas had a previous arrest for the misdemeanor offense of failure to identify, he had no criminal conviction and no history of violent acts. She testified that Cardenas "had a mari[j]uana problem" and recently "started drinking alcohol." Martinez further testified that none of Cardenas's immediate family had a history of criminal activity.
According to Martinez, Cardenas had no connections outside of the United States except for her recent marriage to a man who lives in New Delhi, India; she travels there every two months. Martinez stated that she, her husband, and a close friend believe that they could pool resources and post a $75,000 surety bond. She testified that Cardenas's family offered to support him upon release and to help provide supervision in addition to any court-ordered supervision. Martinez also testified that she was unable to force Cardenas to do something he did not want to do, although she had sent him to rehabilitation for marijuana use because she "had the authority to do so."
On cross-examination, Martinez agreed that she was aware that Cardenas had provided the police with a fake identification and that he had run from the police. Martinez also acknowledged that Cardenas was using "harder narcotics" than just marijuana and alcohol.[3] Martinez testified that her family intended to control Cardenas if he was out on bond by making "arrangements to be with him at all times" and by agreeing to house arrest, if that was possible. She also testified that "he wanders off a lot." Martinez agreed that she was aware that, during jail phone calls, Cardenas had indicated he was not interested in house arrest. According to Martinez, "it just has to be an option, he can be in jail or be restrained to the house ...."
b. Jose Luis Tejeda, Cardenas's Friend
Jose Luis Tejeda, a sixty-three-year-old friend of Cardenas, testified for the defense. He explained that Cardenas was one of his grandson's best friends, and for a while, Cardenas had lived with him, his wife, and three of his grandsons. According to Tejeda, during that time, Cardenas was very respectful to the whole family. Tejeda testified that he did not observe Cardenas committing any violent acts during that time, and he was not aware of any such behavior. Tejeda agreed that he offered to support Cardenas's family in supervising him and in assuring his court appearances. Tejeda explained that he could do so by taking Cardenas to his home located in the country where "it's a lot easier to control him."
c. Amy Groethe, Investigator for the Victoria Police Department
For the State, the record reveals that on June 13, 2017, Investigator Amy Groethe of the Victoria Police Department submitted a sworn affidavit seeking an arrest *727 warrant for Cardenas on charges of capital murder, aggravated sexual assault, burglary of a habitation with intent to commit other felony, and felony theft/unauthorized use of a motor vehicle. That affidavit, of which the court took judicial notice, stated that on June 12, 2017, the Victoria Police Department received a 911 call that a female was unconscious and not breathing and that "there was blood everywhere." The affidavit continued:
• Investigator Groethe responded to the location for this call where she found the body of Rachael Mussett, a sixty-one-year-old woman who appeared to have been severely beaten, naked from the waist down, with her legs spread apart, and severe bruising on the inside of her thighs.
• The furniture in the apartment appeared to be broken and damaged, and there was blood on the apartment's walls, floor, and doors.
• Mussett's rental vehicle was missing from the location and several of Mussett's personal possessions were missing from her residence.
• Rexsanna Tracy informed the Victoria County Sheriff's Office that Cardenas told her son, Michael Tracy, that he had "broken into an old white lady's house and punched her in the face." She relayed that Michael had helped Cardenas clean blood from his shoes and clothing.
• Detective Rendon interviewed Michael, who told him that Cardenas had admitted to punching and kicking the woman he had robbed.[4]
• Detective Rendon received several items of physical evidence from the Tracy residence, including a guitar taken from Mussett's residence.
The State confirmed this affidavit evidence through the bond-hearing testimony of Investigator Groethe.
At the hearing, Investigator Groethe additionally confirmed that she was familiar with the crime scene and explained that the physical evidence showed that Mussett had struggled, that there was bruising all over her body, and that "the cast off from the blood splatter was everywhere"-in every room of Mussett's house. Investigator Groethe testified that Mussett died from strangulation and that her hyoid bone had been broken. She confirmed that there were physical indications of sexual assault, specifically severe bruising on Mussett's inner thighs, pubic hair on her body that did not match Mussett's, and bloodstain patterns on Mussett that were consistent with heterosexual sex.
According to Investigator Groethe, Mussett had reported her 2002 Honda missing and had rented a second vehicle. The Honda was later recovered from a ditch. The rented vehicle was also found in a ditch; it was wrecked. Investigator Groethe explained that, during her investigation, she found that Cardenas had the keys to both vehicles in his possession. Over Cardenas's hearsay objection, Investigator Groethe related what Cardenas told his friends about stealing the car. And over Cardenas's objection, Investigator Groethe also testified that Cardenas admitted to his friend Julian Cisneros that he "had robbed and beat an old lady" and had stolen Mussett's vehicles.
Investigator Groethe further testified, over Cardenas's hearsay objection, that Lagha Boutarfa, a Victoria County Jail *728 inmate who had been in the cell adjacent to Cardenas's cell, informed the police that Cardenas told him he had taken "XO's," he had "broke into this lady's house," he had wanted to have sex and was frustrated because he was unable to "finish his act" before Mussett died, and he had strangled Mussett.[5] She stated that according to Boutarfa, Cardenas showed no remorse. Investigator Groethe also explained that in addition to having signs of blunt force trauma on Mussett's body, there were also signs of sharp force trauma that had penetrated through her nasal cavity into her sinuses. She believed a cast iron skillet caused this trauma; it was found at the scene with blood all over it. Investigator Groethe confirmed that Mussett also had stab wounds and had been beaten so badly, "that she had a cauliflower ear like a boxer" with her ear being separated from the back of her head. She also explained that Mussett's lip was pulled from her gums and "all cut up inside" and that her scalp was "actually detached from her skull."
Investigator Groethe testified that the police had learned from Boutarfa that Cardenas's motive for breaking into Mussett's house was to get narcotics and that they had learned from Cisneros, Cardenas's friend, that his motive was to steal Mussett's vehicle. Investigator Groethe confirmed that Mussett should have had a prescription for hydrocodone and that it was missing from the residence when the police arrived.
According to Investigator Groethe, she listened to one of Cardenas's jail calls where he joked about not liking his mug shot and bragged about being famous because of the case. She explained that Cardenas treated the charges like a joke and argued with his parents on his jail phone calls. Investigator Groethe also explained that when the police tried to contact Cardenas about this case, he gave the officers a false name and then ran from them.
Finally, Investigator Groethe testified that she did not believe Cardenas's family would be able to control Cardenas if the court released him on bond. She specifically explained that Cardenas's family would not be able to prevent him from using narcotics and that once he took narcotics, he would be uncontrollable. Investigator Groethe also explained how an electronic monitoring device could be easily removed by Cardenas and would be of little value in helping to monitor him should he be released on bond.
3. Probable Cause Found and Bond Set
On July 26, 2017, after hearing the evidence, the trial court found that Cardenas was entitled to bail. Finding that the hearsay objection did not apply in a "situation such as this," the trial court found that, nonetheless, there was "plenty of evidence on probable cause and as to the nature of the crime that [was] not hearsay."
Before setting bond, the trial court provided the following reasoning:
The Court understands the requirements of 17.15 on the amount of the bail and the five factors to be considered. The factors that cause the Court the most concern is, Number 1, it says the bail shall be sufficiently high to give reasonable assurance that the undertaking will be complied with and the nature of the offense and the circumstance under which it was committed are to be considered. There has been introduced as evidence a history of the defendant not wanting to be apprehended and, in fact, actually fleeing, of his own statements to his father that he wasn't going *729 to or did not want to be under house arrest and did not consider that he would do that. And as to the nature and circumstances of the offense, I think it is incredulous or extends beyond anybody's understanding that it is not the brutality of which is almost unspeakable. And the Court's going to take into consideration the circumstances under which the crime was committed and the Court has ample evidence before it that there's probable cause, more likely than not, that the defendant committed the crime, and there is evidence that causes the Court some concern as to the defendant's belief or my belief that the defendant will, in fact, show up.
After hearing all of the evidence and explaining that it was not "echoing what the State said," the trial court determined that it "was going to set a [combined] $750,000 bond based on the factors in Article 17.15." The court ordered no conditions.
C. Indictment
On July 27, 2017, one day after the bond hearing, Cardenas was indicted in Cause Number 17-07-30100-D for the offense of capital murder, alleged to have been committed against Mussett on or about June 12, 2017 in Victoria County, Texas. See TEX. PENAL CODE ANN. § 19.03(a)(2) (West, Westlaw through 2017 1st C.S.). That same day, Cardenas was indicted in Cause Number 17-07-30101-D for the offense of aggravated sexual assault and in Cause Number 17-07-30102-D for the offense of burglary with intent to commit a felony, both alleged to have been committed against Mussett on or about June 12, 2017 in Victoria County, Texas. See id . §§ 22.021, 30.02(d) (West, Westlaw through 2017 1st C.S.).
D. Appeal
Cardenas timely appealed from the trial court's bond determination.
II. THE AMOUNT OF THE BOND
By his first issue, Cardenas contends that the trial court abused its discretion in setting his bail at $750,000-ten times the amount he claims he could post-when he was seventeen years old and a lifelong resident of the jurisdiction. Cardenas asserts that by its actions, the trial court set the bond so high he could not afford it, making it an instrument of oppression rather than an assurance that he would appear for court. Cardenas also claims that the trial court failed to consider all of the factors in determining the amount of bail, because "the stated basis of the [c]ourt's ruling [only] focused on evidence the defendant fled when officers sought to contact him during the initial investigation, that he did not want to be under house arrest, and the nature of the offense."
In addition, Cardenas argues that it "would have made much [more] sense to have set a bond that was not oppressive and that included reasonable conditions, such as drug testing and treatment, no contact with witnesses in the case, living with a responsible parent or relative upon release, a curfew, and surrendering his passport, GPS monitoring, or house arrest." He contends that appropriate conditions could have addressed the court's concern about Cardenas appearing for court.
A. Standard of Review
We review a trial court's pretrial bail determination under an abuse of discretion standard. See Ex parte Rubac , 611 S.W.2d 848, 850 (Tex. Crim. App. [Panel Op.] 1981) ; Ex parte Gonzalez , 383 S.W.3d 160, 161 (Tex. App.-San Antonio 2012, pet. ref'd) ; Ex parte Beard , 92 S.W.3d 566, 568 (Tex. App.-Austin 2002, pet. denied).
*730 A trial court only abuses its discretion when it acts without reference to any guiding rule or principles; in other words, when the trial court acts in an arbitrary and unreasonable manner. Montgomery v. State , 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (en banc) (op. on reh'g); see TEX. CODE CRIM. PROC. ANN. art. 17.15 (West, Westlaw through 2017 1st C.S.) (instructing the trial court on factors to consider in setting bail); see also Ex parte Digman , No. 03-04-00088-CR, 2004 WL 1404013, at *2 (Tex. App.-Austin June 24, 2004, no pet.) (mem. op., not designated for publication) (setting out that a reviewing court must "measure the trial court's ruling against the relevant criteria by which the ruling was made"). While a court is permitted to exercise its discretion in setting bail, a reviewing court is guided by the parameters set out in the Texas Code of Criminal Procedure. See Wright v. State , 976 S.W.2d 815, 819 (Tex. App.-Houston [1st Dist.] 1998, no pet.) ; see also TEX. CODE CRIM. PROC. ANN. art. 17.15.
B. Applicable Law
The United States and Texas Constitutions protect the right to be free from excessive bail. See U.S. CONST. amend. VIII ; TEX. CONST. art. I, § 11. "The chief purpose of bail is to secure the presence of the defendant in court for trial." Ex parte Dupuy , 498 S.W.3d 220, 230 (Tex. App.-Houston [14th Dist.] 2016, no pet.) (citing Ex parte Vasquez , 558 S.W.2d 477, 479 (Tex. Crim. App. 1977) ). Determining the appropriate bail amount is a balancing act "between the defendant's presumption of innocence and the State's interest in assuring the defendant's appearance at trial." Ex parte Beard , 92 S.W.3d at 573.
Article 17.15 of the code of criminal procedure instructs the trial court to consider five factors in setting bail: (1) that the bail be set sufficiently high to insure compliance; (2) that the bail not be used as a tool of oppression; (3) the nature of the offense the accused is suspected of having committed and the circumstances under which it was committed; (4) the ability of the defendant to make bail; and (5) the future safety of the victim and the community. See TEX. CODE CRIM. PROC. ANN. art. 17.15 ; DePena v. State , 56 S.W.3d 926, 927 (Tex. App.-Corpus Christi 2001, no pet.). In addition to the guidelines provided by the article 17.15 factors, the trial court should consider other things such as the defendant's family and community ties, defendant's length of residency, his work record, prior criminal record, conformity with previous bond conditions, other outstanding bonds, and aggravating circumstances alleged to have been involved in the charged offense. Ex parte Rubac , 611 S.W.2d at 849-50.
Cardenas acknowledges that there is no definite number or cutoff point making a bail amount reasonable or unreasonable; rather, a reasonable bail amount is determined on a case-by-case basis, weighing factors unique to each defendant and each offense. See Ex parte Beard , 92 S.W.3d at 571-72 (reviewing capital-murder-bail cases as instructive and reducing the $8,000,000 bail to $500,000 where a capital murder defendant solicited the death of her wealthy husband). As the Austin Court observed in Beard ,
case law is of relatively little value in addressing the ultimate question of the appropriate amount of bail in a particular case because appellate decisions on bail matters are often brief and avoid extended discussions, and because the cases are so individualized that generalization from results reached in others is difficult.
Id. at 571 (internal quotations and citation omitted).
*731 C. Discussion
As set out above in this first issue, Cardenas argues that the trial court abused its discretion by making his bond oppressive, by failing to consider all relevant factors in setting his bond, and by not setting a lower bond with reasonable conditions to achieve his appearance in court. We are not persuaded by Cardenas's arguments.
1. Article 17.15 Factors
a. The Bond Must Be Sufficiently High to Insure Trial Appearance
As to the first article 17.15 factor, Cardenas is suspected of capital murder and two first-degree felonies, aggravated sexual assault and burglary of a habitation with intent to commit a robbery. Because Cardenas faces a significant potential sentence, possibly a life sentence, the trial court could have reasonably concluded that there is a possibility that Cardenas will not appear for trial and that bail should "be sufficiently high to give reasonable assurance that" Cardenas will appear at trial. See TEX. CODE CRIM. PROC. ANN. art. 17.15(1) ; Ex parte Nimnicht , 467 S.W.3d 64, 67-68 (Tex. App.-San Antonio 2015, no pet.). Furthermore, testimony developed at the habeas hearing established that Cardenas gave the police a false identification in this case and attempted to flee from the officers. And his mother testified that Cardenas had a previous arrest for the misdemeanor offense of failure to identify. Cardenas also has a family connection in India, where his step-father lives and his mother travels every two months. A clear connection to another country is a factor that a trial court can properly consider in determining the proper bail level. See Gonzalez, 383 S.W.3d at 165-66.
In addition, based on the evidence at the hearing, the trial court could have concluded that Cardenas's family would not be able to control Cardenas or get him to his court appearances. Cardenas's mother testified that she was unable to make Cardenas do something he did not want to do and acknowledged that she did not know how she would keep him under house arrest against his will. Martinez also claimed she was not aware of the full extent of Cardenas's drug usage. In other words, the family's ability to insure compliance should Cardenas be released appears uncertain.
The testimony at the habeas hearing further established that it would be Cardenas's family and friends, and not Cardenas himself, who would put up the money for any bond he received. Because it would be Cardenas's family's assets that were at risk rather than his own, Cardenas would have little or no incentive to appear at trial. See Ex parte Brown , 959 S.W.2d 369, 373 (Tex. App.-Fort Worth 1998, no pet.) ; see also Ex parte Saldana , Nos. 13-01-00360-CR, 13-01-00361-CR, 2002 WL 91331, at *5 (Tex. App.-Corpus Christi 2002, no pet.) (mem. op., not designated for publication). We note, however, that while a bond set at a high level may not directly affect Cardenas's behavior because he had nothing monetarily to lose, Cardenas's family and friends who funded the bond would have a much greater incentive to insure that Cardenas complied with any bond conditions and appeared at trial.
Nonetheless, Cardenas has a motive to flee as he is charged with capital murder, aggravated sexual assault, and burglary of a habitation with intent to commit another felony. He has a history of falsely identifying or failing to identify himself to police and of running from police. Cardenas has a family connection in a foreign country that would facilitate his fleeing. He also has a family that will likely have difficulty controlling him, and a bond, if lowered, that *732 would be obtained through other's assets. Based on these considerations, the first article 17.15 factor supports the trial court's decision to set Cardenas's combined bond at $750,000. See TEX. CODE CRIM. PROC. ANN. art. 17.15(1).
b. The Bond Cannot Be a Tool of Oppression
In reviewing the second article 17.15 factor to determine whether a bond has been set at a level to make it an instrument of oppression, which Cardenas asserts happened in this case, courts have looked at the amount of the bond in relation to bonds set for in other cases and for other crimes. Ex parte Emery , 970 S.W.2d 144, 146 (Tex. App.-Waco 1998, no pet.) (reducing the bond in a delivery-of-a-controlled-substance case from $100,000 to $35,000 and reviewing bond reduction cases under the article 17.15 oppression factor); see Smithwick v. State , 880 S.W.2d 510, 512 (Tex. App.-San Antonio 1994, no pet.) (reducing a $500,000 bond to $100,000 where the defendant, who was charged with murder and injury to a child, requested a reduction to $10,000 for each charge, the facts surrounding the offense were not developed, and the State offered no evidence regarding the safety of the community upon the defendant's release in order to contradict the evidence of community members who signed a petition in favor of bail reduction); Ex parte Beard , 92 S.W.3d at 571-72 (reducing bail from $8 million to $500,000 in a capital murder case and discussing and comparing a variety of bond reduction capital murder cases); see also Ex parte Saldana , 2002 WL 91331, at *4-5 (concluding that "[u]nder the circumstances of this case, the trial court did not abuse its discretion in setting the bond at $1,000,000, as appellant [who was charged with capital murder, murder, and engaging in organized criminal activity] may pose a flight risk or a danger to the community, if bond is reduced" and reviewing cases in which similar bond amounts were reduced, but recognizing that in many of the cases facts and circumstances surrounding the crime were not developed at the habeas corpus hearing). Courts of appeals, including this Court, have upheld pretrial bonds as high as a million dollars and more for defendants facing capital murder charges. See, e.g. , Gonzalez , 383 S.W.3d at 167 (upholding a capital murder pretrial bond that was set at $1.5 million); Ex parte Saldana , 2002 WL 91331, at *6 (upholding a $1 million bond for a capital murder defendant); Ex parte Brown , No. 05-00-00655-CR, 2000 WL 964673, at *2 (Tex. App.-Dallas 2000, no pet) (op., not designated for publication) (upholding a $1 million bond for a capital murder defendant). And the Texarkana Court of Appeals upheld bonds for a defendant facing multiple capital murder counts where the aggregate amount of the bonds exceeded $1 million. See Ex parte Henson , 131 S.W.3d 645, 651 (Tex. App.-Texarkana 2004, no pet.) (authorizing a total bond of $1.5 million through a $500,000 bond on each of the three capital murder counts).
In this case, Cardenas's bond was set at a level lower than the bond levels for other capital murder cases. The trial court set Cardenas's bond at $750,000 to cover three charges; it covered not only his capital murder charge, but also his charge for aggravated sexual assault and his charge for burglary of a habitation with the intent to commit a robbery. The trial court set his bond at one-third of what the State requested; the State asked for a $750,000 bond on each of Cardenas's counts. We cannot conclude that the trial court set the bond as a tool of oppression, as Cardenas asserts. See TEX. CODE CRIM. PROC. ANN. art. 17.15(2).
Moreover, the fact that the trial court did not order any bail conditions *733 does not establish that the trial court meant for its bond order to be a tool of oppression. Neither the State nor Cardenas requested bail conditions. Cardenas has not provided any Texas case law that would impose a requirement that the court place conditions on any bond. And there is no support in the record to establish that the conditions suggested by Cardenas, such as abiding by a curfew, residing with a responsible parent or relative, living under house arrest, participating in a drug treatment program, having no contact with witnesses in this case, or surrendering his passport, would have been reasonable or would have proven effective in guaranteeing Cardenas's appearance at trial or the safety of the community.[6] See Ex Parte Allen-Pieroni , 524 S.W.3d 252, 255 (Tex. App.-Waco 2016, no pet.) (quoting Ex parte Anunobi , 278 S.W.3d 425, 427 (Tex. App.-San Antonio 2008, no pet.) (" 'A condition of pretrial bail is judged by three criteria: it must be reasonable; it must be to secure the defendant's presence at trial; and it must be related to the safety of the alleged victim or the community.' ") ); see TEX. CODE CRIM. PROC. ANN. art. 17.15 ; see also ids="8157968" index="27" url="https://cite.case.law/sw3d/278/425/#p427">id. art. 17.40 (West, Westlaw through 2017 1st C.S.) ("To secure a defendant's attendance at trial, a magistrate may impose any reasonable condition of bond related to the safety of a victim of the alleged offense or to the safety of the community[.]").
The bond, covering a capital murder felony and two first-degree felonies, with or without conditions, was set at a permissible level that is fully in accord with the bonds from similar cases. As such, the second factor also supports the trial court's bond determination. See TEX. CODE CRIM. PROC. ANN. art. 17.15(2).
c. Nature of the Offenses and the Circumstances under Which They Were Committed, Including Aggravating Factors
"The primary factors to be considered in assessing the reasonableness of bail are the nature of the offenses and the punishments that may be imposed." Dupuy , 498 S.W.3d at 230 (citing Ex parte Rubac , 611 S.W.2d at 849 ); see TEX. CODE CRIM. PROC. ANN. art. 17.15(3). "When the offense is serious and involves aggravating factors that may result in a lengthy prison sentence, bail must be set sufficiently high to secure the defendant's presence at trial." Dupuy , 498 S.W.3d at 230 (citing Ex parte Castillo-Lorente , 420 S.W.3d 884, 888 (Tex. App.-Houston [14th Dist.] 2014, no pet.) ); see TEX. CODE CRIM. PROC. ANN. art. 17.15(3) ; see also Ex parte Saldana , 2002 WL 91331, at *4-5 (finding that the key factors of (1) committing a violent, unprovoked killing and (2) demonstrating an "appalling lack of concern for human life" justified the defendant's $1,000,000 bond).
In this case, Cardenas allegedly beat and stabbed a sixty-two-year-old woman, sexually assaulted her, and murdered her by strangulation. There was testimony from the habeas hearing that Cardenas has displayed no remorse for his actions. Instead, one witness testified that Cardenas treated the events as a joke and seemed proud of what he did with his only regret being that the woman died before he could "finish." The court of criminal appeals has established that aggravating factors involved in the offense are relevant to consider in determining what constitutes a reasonable bond. See Ex parte Rubac , 611 S.W.2d at 849-50. So we, too, *734 consider these aggravating factors in our review.
It is also appropriate to consider the possible punishment. See Ex parte Rodriguez , 595 S.W.2d 549, 550 (Tex. Crim. App. [Panel Op.] 1980). Cardenas, as a seventeen-year-old offender, is facing a possible life sentence. See , e.g. , TEX. PENAL CODE ANN. § 12.31(a)(1) (West, Westlaw through 2017 1st C.S.) ("An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for ... life, if the individual committed the offense when younger than 18 years of age. ..."); Lewis v. State , 428 S.W.3d 860, 863 (Tex. Crim. App. 2014) ("Life imprisonment, with the possibility of parole, is the mandatory sentence for defendants convicted of capital murder for crimes they committed as juveniles.").
In sum, given the violent and brutal nature of Cardenas's alleged actions, his lack of remorse, and the life sentence he is facing, it is clear that this article 17.15 factor-the nature and circumstances of the alleged offenses-supports the trial court's $750,000 bond determination. See Dupuy , 498 S.W.3d at 230 ; see also TEX. CODE CRIM. PROC. ANN. art. 17.15(3) ; Ex parte Saldana , 2002 WL 91331, at *4-5.
d. Ability to Make Bail
The fourth article 17.15 factor, the ability to make bail, is the only factor that may favor Cardenas's position. See TEX. CODE CRIM. PROC. ANN. art. 17.15(4). Cardenas contends that bail set by the trial court was ten times the amount he could post, and as such, it was an instrument of oppression. Yet simply because a defendant cannot post a bond does not render the bond excessive or oppressive. See Ex parte Vance , 608 S.W.2d 681, 683 (Tex. Crim. App. [Panel Op.] 1980) ; see also Saldana , 2002 WL 91331, at *4. To hold otherwise would be to turn the trial court into a spectator at bond hearings. Ex parte Miller , 631 S.W.2d 825, 827 (Tex. App.-Fort Worth 1982, pet. ref'd) ; see also Saldana , 2002 WL 91331, at *4. The defendant would be in the position to determine the amount of his bond. Ex parte Miller , 631 S.W.2d at 827 ; see Ex parte Hunt , 138 S.W.3d 503, 506 (Tex. App.-Fort Worth 2004, pet. ref'd) (providing that the trial court's role in setting bail would be unnecessary and the accused would be able to set his own bail, if the ability for a defendant to make bail in a specified amount controlled); see also Saldana , 2002 WL 91331, at *4.
Instead, the ability to make bond must be weighed against the other article 17.15 factors discussed above, including the nature and circumstances of the offense and the possible punishment. See Ex parte Davila , 623 S.W.2d 408, 410 (Tex. Crim. App. [Panel Op.] 1981) ; Ex parte Miller , 631 S.W.2d at 827. In this case, with the violent nature and circumstances of the offense and the possibility of life in prison, Cardenas's arguable inability to make a $750,000 bond does not render the bond unreasonable. This factor weighs only slightly in favor of Cardenas. See TEX. CODE CRIM. PROC. ANN. art. 17.15(4).
e. Future Safety of the Community
As for the fifth article 17.15 factor, the future safety of the community, the evidence at the habeas hearing showed that Cardenas struggled with Mussett in every room of her house, struck her with a cast iron skillet, stabbed her, and sexually assaulted her. See TEX. CODE CRIM. PROC. ANN. art. 17.15(5). The violent nature of the alleged capital murder and aggravated sexual assault offenses demonstrate a potential risk to the community. See id .; see also *735 Ex parte Bowman , No. 14-17-00736-CR, 2017 WL 6545099, at *3 (Tex. App.-Houston [14th Dist.] 2017, no pet.) (per curiam). The evidence suggests that Cardenas's actions were motivated by his own desires and frustrations. And, as revealed by the evidence, if Cardenas, who showed no remorse, used narcotics again, he could be uncontrollable and may offend again if released on bond. See TEX. CODE CRIM. PROC. ANN. art 17.15(5) ; see also Ex parte Bowman , 2017 WL 6545099, at *3. The trial court could have determined that Cardenas is a potential danger to public safety. We conclude that the factor that considers the future safety of the community also supports the trial court's decision to set Cardenas's bond at $750,000. See TEX. CODE CRIM. PROC. ANN. art. 17.15(5) ; Dupuy , 498 S.W.3d at 232.
2. Other Factors from Rubac
As for family, community, and other ties to the area, there is evidence in the record that Cardenas is a United States citizen and a lifelong resident of Victoria, Texas. See Ex parte Rubac , 611 S.W.2d at 849-50. His father, his mother, his siblings, and his extended family live in Victoria; no immediate family had a history of criminal activity. Tejeda, a family friend, offered his support in the supervision of Cardenas.
According to his mother, although Cardenas had a previous arrest for the misdemeanor offense of failure to identify and had run from the police and provided them with fake identification in this case, he had no prior criminal conviction and no history of violent acts. See ids="9953099" index="51" url="https://cite.case.law/sw2d/611/848/#p850">id. She testified that Cardenas "had a mari[j]uana problem" and recently had "started drinking alcohol." Martinez also testified that Cardenas was using "harder narcotics." We conclude that these Rubac factors weigh only slightly in favor of Cardenas.
We note that there is nothing in the record concerning Cardenas's work record. See ids="9953099" index="52" url="https://cite.case.law/sw2d/611/848/#p850">id. There is nothing concerning his conformity with previous bond conditions or other outstanding bonds because there were none. See ids="9953099" index="53" url="https://cite.case.law/sw2d/611/848/#p850">id. So, the remaining Rubac factors are not implicated in this case. See id.
D. Summary
Determining this issue on a case-by-case basis and weighing the factors unique to Cardenas and to each offense, we conclude that the trial court did not abuse its discretion when it set Cardenas's bail at $750,000. See id. ; Ex parte Beard , 92 S.W.3d at 571-72 ; see also TEX. CODE CRIM. PROC. ANN. art. 17.15. The circumstances of the offenses as set forth in the indictment and the evidence at the hearing depict a violent, unprovoked killing and demonstrate lack of remorse. Cardenas may pose a flight if the trial court reduces his bond because, if convicted, Cardenas faces life imprisonment. The testimony also revealed that Cardenas provided false identification, attempted to flee from the police, and expressed a reluctance to submit to any restrictions on his movement. And it appears from the record that the trial court may have had serious concerns about the future safety of the community. Finally, the trial court may have concluded that Cardenas's ties to his family and the community and his lack of a criminal history were insufficient to assure his appearance at trial. See Ex parte Rubac , 611 S.W.2d at 849-50 ; see also Ex parte Brown , 959 S.W.2d at 373 ; Ex parte Wright , No. 14-09-00805-CR, 2010 WL 1609235, at *5 (Tex. App.-Houston [14 Dist.] April 22, 2010, no pet.) (per curiam) (mem. op., not designated for publication.).
It is apparent that the trial court considered the five factors set out in article 17.15 of the Texas Code of Criminal Procedure, as well as the relevant factors from Rubac , *736 and set a reasonable bond amount. See TEX. R. CRIM. PROC. ANN. § 17.15; Ex parte Rubac , 611 S.W.2d at 849-50. We overrule Cardenas's first issue.
III. HEARSAY EVIDENCE
By his second issue, Cardenas contends that the trial court improperly allowed and considered hearsay evidence to establish probable cause in the proceeding. He claims that the State failed to provide the court with sufficient evidence of probable cause at the hearing, and the trial court improperly allowed hearsay evidence, which provided the sole basis for connecting Cardenas to the alleged crime. But, as the State notes, this argument is moot because Cardenas has since been indicted for the offenses at issue in his habeas hearing.
Cardenas was arrested on or about June 12, 2017 in Victoria County, Texas, for burglarizing Mussett's home and for committing aggravated sexual assault and capital murder against Mussett. His July 26, 2017 habeas hearing concerned these accusations. From our review of the record, on July 27, 2017, Cardenas was indicted in Cause Number 17-07-30100-D for the offense of capital murder against Mussett, in Cause Number 17-07-30101 for the offense of aggravated sexual assault against Mussett; and in Cause Number 17-07-30102 for the offense of burglary of a habitation with commission of the felony offense of robbery against Mussett. The three indictments returned against Cardenas all relate to the same offenses that were at issue in his habeas hearing.
The return of an indictment establishes probable cause as a matter of law and so renders any appellate challenge on the question of probable cause moot. Ex parte Branch , 553 S.W.2d 380, 381 (Tex. Crim. App. 1977). In this case the return of the indictments against Cardenas in Cause Numbers 17-07-30100-D, 17-07-30101-D and 17-07-30102-D renders his challenge against probable cause to hold him moot. See ids="9938552" index="62" url="https://cite.case.law/sw2d/553/380/#p381">id. We overrule Cardenas's second issue. See id.
IV. CONCLUSION
We affirm the trial court's order setting Cardenas's bond at $750,000.

The arrest warrant included felony theft/unauthorized use of a motor vehicle, an offense for which Cardenas was not indicted.

It is undisputed that Cardenas was in custody when he filed his brief.

At the hearing, Investigator Amy Groethe testified that Martinez had previously told the police she had found a substance in Cardenas's possession that she believed to be heroin.

We note that Investigator Groethe later testified that during an interview, Michael Tracy described Cardenas as covered in blood when he showed up at his home, admitted to helping Cardenas clean the blood off his shoes, and reported that Cardenas told him that he had "stomped and beat the lady" and knew that he had killed Mussett.

At this point, the trial court granted Cardenas a running hearsay objection.

We offer no opinion as to the reasonableness or the effect of any condition suggested by Cardenas or of any condition that the trial court might impose. That matter is not before us. See Tex. R. App. P. 47.1.