

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00016-CR

_____

Ex parte Jay Allen Rotter

_____

On Appeal from the 211th District Court
Denton County, Texas
Trial Court No. F20-2507-431

_____

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Appellant Jay Allen Rotter, a former narcotics officer with the Tarrant County Sheriff's Department, stands charged with murder, tampering with evidence, and possession of a controlled substance. Bail was initially set at $1 million, $150,000, and $10,000, respectively, but after Rotter applied for habeas relief the trial court partially granted his request and lowered the bail amount for the murder charge to $750,000 and the tampering charge to $10,000. It did not lower the bail amount for the possession charge. Rotter appeals the trial court's partial grant of relief in respect to the murder charge, arguing that the trial court abused its discretion by not lowering it further. Because we cannot conclude that the trial court erred by setting bail at $750,000 for the murder charge, we affirm its order partially granting the requested relief.

### Background

On August 26, 2020, Rotter called 911 to report that his girlfriend, Leslie Hartman, had shot and killed herself. During a police interview the next day, Rotter claimed that Hartman had retrieved his duty weapon without his knowledge and then shot herself "while they were hugging each other," and he immediately called 911. But Detective Rodney Mooneyham became suspicious of Rotter's explanation of events when Rotter reset his phone to factory settings as Detective Mooneyham briefly stepped out of the room. After considering video footage recovered from a neighbor's surveillance camera and data recovered from Hartman's phone and

2

Rotter's computer,[1] Detective Mooneyham concluded that Rotter had murdered Hartman. The following is a recitation of relevant facts as testified to at the bail hearing and as sworn to by Detective Mooneyham in his probable-cause affidavit, which was admitted into evidence.

Text messages sent by Hartman to a friend on the night she died did not suggest that she was feeling depressed or suicidal, but they did describe Rotter as "in a 'mood'" and that he needed to "sort himself out" because he was "having trouble with the amount of drugs he . . . [was] consuming."[2] Her last message, sent at 11:12 p.m., commented on the weather.

The neighbor's surveillance camera recorded the sound of one gunshot at approximately 11:04 p.m. the night Hartman died—thirty minutes before Rotter's 11:34 p.m. call to 911. At 11:06 p.m., Rotter posted in a Discord[3] chat room that he had gone into the backyard and "killed that milk bomb." Detectives recovered a shell casing and milk bottle with a bullet hole through it in the backyard.

---

[1]The phone and computer were searched pursuant to search warrants.

[2]Detective Mooneyham downplayed depressed or suicidal text messages and "chat messages" sent at other times by Hartman by explaining that each time she mentioned suicidal thoughts she also said that she could not go through with it because she "ha[d] to live for [her] mom," who was battling cancer at the time.

[3]Detective Mooneyham described Discord as "a gaming app where a lot of people who play a lot of games, they talk to each other online."

At 11:08 p.m., Rotter posted on Discord a photo of him holding a Glock pistol in what appeared to be the bedroom in which Hartman later died. In the background of the picture, a computer monitor displayed an image of a Discord chat room. At 11:13 p.m., Rotter reported on Discord that he and Hartman were arguing over his firing the gun in the backyard.

At 11:14 p.m., Rotter posted on the Discord chat server, "I just sent a 9 millie in this fuckin hippie." Detective Mooneyham interpreted the "hippie" comment as referring to Hartman because she was "eco-friendly, [a] nature lover, and . . . use[d] psychedelic drugs."

In September 2020, Rotter attempted suicide shortly after Detective Mooneyham informed Rotter that he had obtained a search warrant for Rotter's DNA. In September 2020, he was arrested, and his bail was set at $1 million for the murder charge, $150,000 for tampering with evidence, and $10,000 for the drug-possession charge. He applied for a writ of habeas corpus, arguing that the bail amounts were unreasonably high and asking the trial court to lower the murder-charge bail to $50,000.

At the habeas hearing, Rotter's ex-wife, his mother, and the mother of his child testified collectively that Rotter could post a maximum bond of $125,000 and that they would ensure that he would comply with bond conditions. His ex-wife, Jessica Bowman, testified to her management of his finances, that his retirement funds had been used to pay legal fees, and that he only had a couple thousand dollars left in his

4

savings account. Norissa Byrne, the mother of his child, testified that she had agreed to suspend his child-support obligation during the pendency of these proceedings. An area bail bondsman, Shawn Cagle, testified that the most the family could come up with is $12,500, giving them bonding power of $125,000.

Rotter's mother testified that he does not pose a threat to the community and that he is willing to go to therapy, but Detective Mooneyham testified to his concern that Rotter may attempt suicide again if released.

At the end of the hearing, the trial court partially granted relief by reducing the murder bail to $750,000 and the evidence-tampering bail to $10,000. Rotter only appeals the trial court's decision in respect to the murder bail.

## Discussion

Rotter complains the trial court abused its discretion for three reasons:[4] (1) proper consideration of the relevant factors dictates that the bail amount should be lower; (2) the $750,000 bail amount is incongruent with similar cases reviewed in Texas courts; and (3) the $750,000 bail amount is "presumptively oppressive."

### I. Standard of Review

The primary purpose for setting bail is to secure the presence of the defendant in court at his trial. *Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977). The amount should be sufficiently high to give reasonable assurance that the

---

[4]Rotter presents his argument as one issue with the three categories as subissues.

defendant will comply with the undertaking but should not be set so high as to be an instrument of oppression. *Ex parte Bufkin*, 553 S.W.2d 116, 118 (Tex. Crim. App. 1977). In setting bail, courts are to consider certain factors including the length of the sentence and nature of the offense, including any aggravating factors; the defendant's work history, family ties, and length of residency; the defendant's ability to post the bond; any prior criminal record; and conformity with past bond conditions. Tex. Code Crim. Proc. Ann. art. 17.15; *Ex parte Rubac*, 611 S.W.2d 848, 849–50 (Tex. Crim. App. [Panel Op.] 1981).

In contesting the amount of bail, the defendant has the burden to show that it is excessive. *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim. App. 1980). We review the trial court's decision in setting bail for an abuse of discretion, and we will not disturb its decision if it is within the zone of reasonable disagreement. *Ex parte Wood*, 308 S.W.3d 550, 552 (Tex. App.—Beaumont 2010, no pet.).

## II. Application of the *Rubac* factors

Rotter's first subissue evaluates the facts in light of the *Rubac* factors regarding appropriate bail amounts.

### A. Nature of offense and range of possible sentence

The nature of the offense and the possible sentence are the "primary factors" we consider in evaluating a bail decision. *Ex parte Hunt*, 138 S.W.3d 503, 506 (Tex. App.—Fort Worth 2004, pet. ref'd). Rotter stands accused of murder, a first-degree

felony, for which he faces a possible five to ninety-nine years or life in prison and a fine up to $10,000. Tex. Penal Code Ann. §§ 12.32, 19.02.

The trial court was presented with several inconsistencies between Rotter's story of events and other evidence. Though Rotter argues in his brief that the State failed to firmly establish any such "irregularities" or inconsistencies, that was a determination for the trial court to make as the hearing's factfinder. *Cf.* Tex. Code Crim. Proc. Ann. art. 38.04; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The trial court was in the best position to weigh Detective Mooneyham's credibility and his opinion that Rotter lied to police when he reported Hartman's death as a suicide. Given the evidence in the record, we cannot conclude that the trial court erred by finding Detective Mooneyham's testimony credible regarding the nature of the offense for purposes of setting bail.

Detective Mooneyham testified to his review of Hartman's phone and his conclusion that Hartman was not depressed or suicidal on the day she died. He reported that, rather than expressing suicidal ideations, she complained to her friend about Rotter's behavior and drug use that night. In the past, she had disavowed any expressed suicidal thoughts out of concern that she had to take care of her cancer-stricken mother.

The trial court heard how Rotter erased data stored on his phone in the midst of his police interview, potentially destroying evidence similar to the Discord messages found on his computer. Using those messages and a neighbor's surveillance

video, Detective Mooneyham was able to construct a timeline during which Rotter may have shot a milk bottle in the backyard, gotten into an argument with Hartman over firing his gun, and then posted on Discord that they had been arguing and "[he] just sent a 9 millie in this fuckin hippie."

With the prospect of a lengthy prison sentence, the importance of setting bail sufficiently high to secure Rotter's appearance at trial is heightened. *See In re Hulin*, 31 S.W.3d 754, 761 (Tex. App.—Houston [1st Dist.] 2000, no pet.). Combined with the serious nature of the accusations against Rotter—his alleged murder of Hartman and his possible destruction of evidence of the murder—these factors weigh heavily in favor of a high bail amount to ensure his appearance at trial.

**B. Rotter's work history, family ties, and attempted suicide**

Rotter spent 13 years working for the Tarrant County Sheriff's Department and was an undercover narcotics officer at the time of Hartman's death. Byrne, who lives in Fort Worth, testified to his involvement as a father and described him as "very caring, very loving, very providing[,]" and a "wonderful role model." She did not consider him a flight risk. Byrne, Bowman, and his own mother all testified in his support and to their desires to have him released. His mother testified that he was willing to go to therapy if released, and she and Bowman testified that they would report any bond violations if he were released.

Though his family ties could have weighed in favor of a lower bail amount, we agree with the State that the trial court could have considered their importance

8

minimized by evidence of Rotter's suicide attempt and possible drug problem. *See Ex parte Garner*, No. 10-18-00129-CR, 2018 WL 3469834, at *4 (Tex. App.—Waco July 18, 2018, no pet.) (mem. op., not designated for publication) (noting defendant's suicide threats rendered her a flight risk and danger to the community and citing similar holdings). Rotter's mother admitted that Rotter had attempted suicide by pill overdose, and Detective Mooneyham testified that the attempt took place shortly after requesting a DNA sample from Rotter and just before he was arrested and charged with murder. Detective Mooneyham expressed his concern that Rotter was at risk of attempting suicide again if released. Rotter countered this with testimony by a records custodian of the sheriff's office that he had been taken off suicide watch while incarcerated, but the custodian also admitted that Rotter had not participated in any substance-abuse classes such as Narcotics Anonymous.

Viewing his work history and family ties in light of his past suicide attempt and evidence of drug abuse, these factors weigh neutrally—at best—in determining the bail amount.

### C. Rotter's ability to post a bond

Rotter's counsel focused much of his efforts on conveying Rotter's inability to meet a $1 million bail. Bowman, who has been handling Rotter's finances since his arrest, testified that he only had a couple thousand dollars in savings and that his $87,000 retirement fund had been spent after his arrest. Rotter's family and Cagle testified that the most they could gather is $12,500, enough to meet a $125,000 bail

9

requirement. Though this factor weighs against a high bail amount, it is not dispositive. *See Ex parte Jones*, 803 S.W.2d 712, 716 (Tex. Crim. App. 1991). As we and other courts have noted, a defendant's simple inability to meet the bail set by the trial court does not automatically render it excessive; to hold otherwise would completely eliminate the trial court's role in setting bond and place the accused "in the unique posture of determining what his bond should be." *Ex parte Brown*, 959 S.W.2d 369, 372 (Tex. App.—Fort Worth 1998, no pet.) (quoting *Ex parte Miller*, 631 S.W.2d 825, 827 (Tex. App.—Fort Worth, 1982, pet. ref'd)); *see also Ex parte Branch*, 553 S.W.2d 380, 382 (Tex. Crim. App. 1977); *Ex parte Cardenas*, 557 S.W.3d 722, 734 (Tex. App.—Corpus Christi-Edinburg 2018, no pet.); *Wright v. State*, 976 S.W.2d 815, 820 (Tex. App.—Houston [1st Dist.] 1998, no pet.).

### D. Conclusion

Having evaluated the relevant factors, only Rotter's inability to post a $750,000 bail weighs in his favor. Given that the inability to post bail is not a dispositive factor, and considering the nature of the accused crime of murder and potential life sentence, we cannot conclude that the trial court erred by declining to lower his bail below $750,000 on the murder charge. We therefore overrule this portion of his issue on appeal.

## III. Comparing other cases

In his second subissue, Rotter argues that his bail amount runs astray of similar cases reviewed in Texas courts, but his argument is inaccurate. Relatedly, in his third

subissue, Rotter argues that the $750,000 bail is "presumptively oppressive," relying on precedent from our sister court in Houston. *See Ex parte Bogia*, 56 S.W.3d 835, 839–40 (Tex. App.—Houston [1st Dist] 2001, no pet.). We disagree with Rotter on both fronts.

We have previously noted that prior decisions are "of 'relatively little value in addressing the ultimate question of the appropriate amount of bail' in a specific case because appellate decisions on bail matters are often brief and avoid extended discussions, and because the cases are so individualized that generalization from results reached in others is difficult." *Ex parte Murray*, Nos. 02-13-00151-CR, 02-13-00152-CR, 02-13-00153-CR, 2013 WL 5425312, at \*3 (Tex. App.—Fort Worth Sept. 26, 2013, no pet.) (mem. op., not designated for publication) (per curiam) (quoting *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd)).

In the same case, we rejected arguments similar to those Rotter makes in his second and third subissues. The appellant in *Murray* relied on *Ludwig v. State*, just as Rotter does here, to argue that his bail was presumptively too high because the Court of Criminal Appeals reduced Ludwig's bail on a capital murder charge—a charge more serious than Murray's aggravated-assault charge—from $1,000,000 to $50,000. *Id.* (discussing *Ludwig v. State*, 812 S.W.2d 323, 325 (Tex. Crim. App. 1991) (per curiam)). As we explained, "significant factual differences" between Murray's case and Ludwig's made the cases incomparable:

> The defendant in *Ludwig*, despite his alleged threats to the victim and victim's family, owned real property within Texas, was educated, practiced as a licensed veterinarian in Texas, had no prior criminal record, and was involved in a child custody proceeding that would require his presence in the jurisdiction. Here, appellant owns no real property within Texas, has presented no evidence regarding education as it pertains to the likelihood of gainful employment, has presented no more than allusions to possible employment with his stepfather whereby he would earn roughly $1,000 per month or potential employment working on an oil rig with his brother, and, as explained below, has a significant criminal history involving violent crimes.

*Id.* (citation and internal quotation marks omitted). Rotter's case also differs significantly from the situation in *Ludwig*. Rotter owns no real property in Texas, offered no evidence of any plan for gainful employment if released, and attempted suicide just before being charged, calling into question whether his family ties would outweigh flight-risk concerns. Based on the record before us, we conclude *Ludwig* and the other cases cited by Rotter to be incomparable here.

This court and others have affirmed bail amounts set at $750,000 or higher in cases of murder or other serious first-degree felonies. In *Ex Parte Green*, this court affirmed a $1,000,000 bail in a murder case. No. 02-13-00474-CR, 2014 WL 584960, at *2–3 (Tex. App.—Fort Worth Feb. 13, 2014, no pet.) (mem. op., not designated for publication) (collecting similar cases of high bail set in connection with murder charges). In *Murray*, we affirmed a $750,000 bail in the prosecution of an aggravated-assault-with-a-deadly-weapon charge. 2013 WL 5425312 at *4. In a capital-murder prosecution where the defendant did not deliver the fatal blow, we affirmed a

12

$500,000 bail. *Brown*, 959 S.W.2d at 373. We are therefore unpersuaded by Rotter's second subissue.

As for his third and final subissue, we have not adopted *Bogia*'s holding that a $360,000 bail in a theft case is presumptively oppressive, nor do we find cause to adopt its reasoning in the context of this case. *See* 56 S.W.3d at 836. Bail may be deemed oppressive when the trial court sets the bail at an amount "for the express purpose of forcing [a defendant] to remain incarcerated." *Ex parte Harris*, 733 S.W.2d 712, 714 (Tex. App.—Austin 1987, no pet.) (per curiam). The record before us contains no evidence that the trial court's express purpose of setting a $750,000 bail—lowered from $1 million—was to keep Rotter incarcerated. We therefore overrule the remainder of his argument and his sole issue in its entirety.

## Conclusion

Having overruled Rotter's issue on appeal, we affirm the trial court's order.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: May 20, 2021