**Opinion issued May 9, 2023**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-22-00782-CR

———————————

## EX PARTE RENE MORENO, Appellant

---

**On Appeal from the 482nd District Court**
**Harris County, Texas**
**Trial Court Case No. 1788826**

---

## MEMORANDUM OPINION

Appellant, Rene Moreno, challenges the trial court's September 29, 2022 order denying his pretrial application for writ of habeas corpus seeking a reduction in bail.[1]  In two points of error, appellant contends that (1) the trial court abused its

---

[1]  *See* TEX. R. APP. P. 31.

discretion in finding there was sufficient evidence that appellant was a future danger to the community, and (2) the $750,000 bond set by the trial court is oppressive.

We affirm.

## Background

Appellant was arrested on May 18, 2022 and was charged with the felony offense of capital murder.[2] On August 11, 2022, a Harris County Grand Jury issued a true bill of indictment, alleging that appellant, on or about September 3, 2021, "unlawfully, while in the course of committing and attempting to commit the robbery of [complainant], intentionally cause[d] the death of [complainant] by shooting [complainant] with a deadly weapon, namely, a [f]irearm." Appellant remains in custody.

### *June 9, 2022 Bond Hearing*

On June 9, 2022, the trial court held a bond hearing. The trial court heard testimony from three witnesses during the bond hearing: Alfred Vera (a homicide detective for the Harris County Sheriff's Office), Rene Manuel Moreno (appellant's father), and Marc Metze (owner of Better Now Than Later Bail Bonds).

Detective Vera was the lead investigator of the September 3, 2021 shooting incident which led to appellant being charged with capital murder. Detective Vera

---

[2]     *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (defining "capital murder" to include murder committed "in the course of committing or attempting to commit . . . robbery . . .").

testified that appellant and another individual attempted to rob the complainant, who was "selling marijuana" in the parking lot of an apartment complex, and a shootout ensued.

Detective Vera testified that, by the time he arrived on the scene, the complainant had been transported to a local hospital, where he eventually died from injuries sustained in the shootout. Regarding the state of the scene, Detective Vera stated that "there was blood on the concrete of the parking lot and multiple shell casings." Specifically, Detective Vera testified that "over 30 shell casings," from a variety of calibers, were found at the scene.

There was also a "blood trail" that led toward a "grassy area." Investigators were able to obtain video footage from a nearby "Ring doorbell surveillance," which showed two individuals leaving the scene of the crime, one of whom was wearing only one shoe and was limping. The individual who was wearing only one shoe and limping was later identified as appellant, who "got shot in his foot" during the shootout.

Detective Vera also testified that in a separate investigation, the Harris County's Sheriff's Office was investigating the murder of Jonathan Moreno, appellant's brother. In connection with that investigation, the Harris County Sheriff's Office obtained consent to search appellant's cellular telephone. Detective Vera was thereby able to review "text messages, photos, and some news articles

3

found in [appellant's] phone . . . focus[ed] on items related to the September 3[], 2021 shooting." Specifically, Detective Vera was able to review a text message chain, including shared photographs and hyperlinks to news articles, between appellant and a female witness, who was later interviewed by the Harris County Sheriff's Office.

Detective Vera testified that on September 3, 2021, the night of the shooting, at approximately 10:39 p.m., appellant sent a text message to the female witness stating, "I got shot . . .[o]n the foot." The following morning, on September 4, 2021, at 7:48 a.m., appellant texted that he "couldn't go to a hospital that close [because] the law's looking." He also stated that the police "literally blocked up miles of streets," and he "ran two miles" away from the scene. In commenting on the alleged attempted robbery and shootout, appellant texted that complainant "had a 50 drum on a drac and an AR-15 and we had pistols," and that "[l]ike 50 shots was left off." Appellant later stated to the female witness that they "let six in him," but "everything happen for a reason," and appellant "won't regret it unless [he] get locked up."

On September 4, 2021, at 9:57 a.m., appellant sent a photograph to the female witness of a foot which had a hole in the center of it, and which appeared to be covered in blood. This photograph, according to Detective Vera, was also found on appellant's phone. In his text messages with the female witness, appellant also stated that he will "need a boot."

4

Appellant's text messages with the female witness also discussed the police presence after the shooting, commenting that "[t]hey had, like, 40 cops pulled up on the scene." Appellant then stated that "[t]he laws got on foot too eventually," and he fled the scene through some nearby woods, and his "arms is fucked up, too," as he was "running like a slob just pushing through" the trees and brush.

Later that morning, at approximately 11:34 a.m., appellant and the female witness exchanged hyperlinks to news articles regarding the shootout from the previous night. After discussing several of these articles, appellant states, "Ima lay the fuck low."

Detective Vera testified that the Sheriff's Office "was actively looking for" appellant beginning in November 2021. The Sheriff's Office searched for him at his parents' residence, and other locations he was associated with, but he was not found until May 18, 2022, when he was ultimately arrested.

The trial court also heard testimony from Rene Manuel Moreno, appellant's father, regarding their financial condition and their ability to pay a bond for appellant's release pending trial. Mr. Moreno testified that he is a "senior manager at Rudy's Bar-B-Q," making a base salary of approximately $46,000 per year. He also testified that his wife, Raquel Moreno, is "employed at Hobby Lobby," and makes approximately $37,000 per year. In 2018, the Moreno family purchased a home. The Moreno's have approximately $30,000 of equity in their home, which

has a value of approximately $384,000, with an outstanding mortgage loan of approximately $354,000. Mr. Moreno further testified that he has a 401(k)-account worth approximately $34,000. After appellant was arrested, Mr. Moreno also sold a pickup truck he owned, hoping to use the proceeds to pay appellant's bond. Mr. Moreno testified that he profited $18,000 on the sale of his pickup truck.

Mr. Moreno testified at the bond hearing that the family has no other assets to "give as collateral" to pay appellant's bond. However, other family members, including his brother and sister-in-law, have agreed to co-sign to assist in paying appellant's bond.

The trial court also heard testimony from Marc Metze, the owner of Better Now Than Later Bail Bonds. Metze testified that he spoke with the Moreno family "about a bond for" appellant. As of the date of the hearing, Metze testified that the Morenos had approximately $20,000 for payment of a bond. The Morenos had offered to use their home as collateral, but "it is a homestead," and therefore "is not good collateral." Because Texas law requires, "on a case like this," that a bonding company receive at least 10% of the bond amount up front, Metze testified that, based on the state of the Morenos' financial condition, "the max amount" of bond the Morenos could afford would be $200,000.

At the conclusion of the June 9, 2022 hearing, the trial court "assess[ed] a bond at $750,000" for appellant.

*Pretrial Application for Writ of Habeas Corpus*

On September 29, 2022, appellant filed a pretrial application for writ of habeas corpus seeking a reduction in bail, arguing that he "is unable to post bond in such amount," and that the $750,000 bond amount set by the trial court "is unreasonable and penal in nature."[3]  According to the habeas application, appellant's parents, who "would be responsible for [his] bail as well as his legal fees," are not able to afford the bail amount, and that "[s]etting bail at an amount that [he] can afford will not result in his failure to appear because he and his family have too much to lose and nowhere to go."

Notably, appellant's habeas application does not state what amount he could afford.  However, appellant asserted that "there are alternative methods of ensuring community safety instead of keeping [him] in custody," such as "GPS monitoring and supervision by the Community Supervision Department."

Appellant's habeas application also notes that he "has a medical eye condition which requires him to wear specialized contacts to prevent him from losing sight." Since he has been in custody, appellant "has been unable to get access to those contacts."

---

[3]     *See* TEX. CODE CRIM. PROC. ANN. art. 17.15; *see also id.* art. 1.08 ("The writ of habeas corpus is a writ of right and shall never be suspended."); *Ex parte Weise*, 55 S.W.3d 617, 619–20 (Tex. Crim. App. 2001) (when faced with excessive bail, defendant has right to assert his constitutional right to reasonable bail through use of application for pretrial writ of habeas corpus).

*Hearing on Appellant's Habeas Application*

On September 29, 2022, the trial court held a hearing on appellant's pretrial application for writ of habeas corpus for reduction in bail. At the outset of the hearing, the trial court stated that it was "taking judicial notice of the [trial court's] file." At the hearing, appellant called two witnesses to testify, Dr. Brian Cox, an optometrist who treated appellant for several years prior to his arrest, and Raquel Moreno, appellant's mother.

Dr. Cox testified regarding his treatment of appellant for an "ophthalmic condition called anisometropia." Dr. Cox testified that he had been treating appellant for this condition since 2014. Anisometropia is a condition "where the two eyes have significantly different powers between them." Dr. Cox testified that, in appellant's case, "his right eye is nearsighted and his left eye is farsighted with astigmatism." This condition cannot be treated by glasses and is generally treated by use of "contact lenses to minimize any double vision and provide the best optimal clarity."

In appellant's case, the contact lenses prescribed by Dr. Cox "are considered medical necessity, based on insurance." Without his prescribed contact lenses, Dr. Cox testified that appellant would be "[v]isually disabled," and "outside of reaching as far as you can reach, [his vision is] extremely blurry beyond that." Raquel Moreno testified that appellant has "been dealing with" anisometropia since he was four

years old. She testified that she has contacts prescribed by Dr. Cox, but she has been unable to get the contacts to appellant, who has been without his contacts since he was taken into custody on May 18, 2022.

Ms. Moreno testified that she has contacted the jail but was told that "he needed to go through medical . . . that he needed to put in a request." Ms. Moreno "let [appellant] know that he need[ed] to put in a request," but after a month, "nothing was done." At that point, Ms. Moreno "went to the jail [herself], in person, and [she] talked to one of the officers in the front." Ms. Moreno was told that "glasses were okay to bring in," however, Ms. Moreno and Dr. Cox testified that glasses would not help with appellant's condition, and at the time of the hearing, appellant had not been permitted his contact lenses.

Ms. Moreno testified that appellant "complained about headaches due to not being able to see," and that, because of his vision impairment, his ability to engage in any activity was limited. Ms. Moreno stated that she believed appellant had made "at least 30" requests to medical for assistance with his condition, all of which have gone ignored. Ms. Moreno was "afraid that [appellant is] not able to keep his mind busy while he is" in custody because "he's not able to read any books. He can't really do anything because he can't see. He is not able to watch TV. He's not able to do anything." Notably however, Ms. Moreno testified that she is not aware of anyone asking the trial court to "order the jail . . . to give [appellant] his contacts."

9

With respect to the amount of his bond, Ms. Moreno testified that she has "tried everything to bail [appellant] out." She testified that the family has "made several contacts" with a bondsman and sold a truck for approximately $20,000. Ms. Moreno and her husband have approximately $40,000 in equity in their home and discussed selling their home. However, Ms. Moreno testified that the bondsman told her and her husband that "even if [they] sell the house, [they] won't be able to bail [appellant] out because [they] don't have any personal equity on anything else to back up the bail." According to Ms. Moreno, the bondsman stated to her and her husband that they "would need [$750,000] in collateral."

Ms. Moreno testified that her husband "is a manager at Rudy's Bar-B-Q," and that she "work[s] at Hobby Lobby" and has "been doing Uber Eats." She stated that there is no other way, or time, they could gain any extra income, and no other way they know of to change their financial status. However, if she was able to bond her son out, he could live at home and be placed on a 24-hour house arrest.

### Trial Court's Ruling

At the conclusion of the hearing on appellant's pretrial application for writ of habeas corpus, the trial court denied appellant's application. The trial court noted that "it is the [trial court's] impression" that it "would have to reduce the bond to $50,000 for [appellant's] parents to have the ability to make that bond and [appellant] would be released." The trial court further noted that it "recall[ed] the

testimony presented by the State and the Defense during the" June 9, 2022 bail hearing, and that it "is going to deny" appellant's pretrial application for writ of habeas corpus and "leave the bond at $750,000" for the felony offense of capital murder.

## Standard of Review

It is not the purpose of this Court, nor does this Court have the authority, to grant habeas corpus relief in criminal cases. *See* TEX. GOV'T CODE ANN. § 22.221(d) (limited jurisdiction of intermediate appellate courts to issue writ of habeas corpus where "the restraint of liberty is by virtue of an order, process, or commitment issued by a court or judge because of the violation of an order, judgment, or decree previously made, rendered or entered by the court or judge in a civil case"); TEX. CODE CRIM. PROC. ANN. art. 11.05 ("The Court of Criminal Appeals, the District Courts, the County Courts, or any Judge of said Courts, have power to issue the writ of habeas corpus . . ."). In an appeal from an order denying habeas relief for a claim of excessive bail, we are limited to reviewing a trial court's decision about the amount of bail for an abuse of discretion. *See Ex parte Rubac*, 611 S.W.2d 848, 850 (Tex. Crim. App. 1981); *Montalvo v. State*, 315 S.W.3d 588, 592 (Tex. App.— Houston [1st Dist.] 2010, no pet.).

A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Ex parte Hunt*, 138 S.W.3d 503, 505 (Tex. App.—Fort Worth

2004, pet. ref'd). A reviewing court will not disturb a decision of the trial court if that decision is within the zone of reasonable disagreement. *Ex parte Tata*, 358 S.W.3d 392, 397 (Tex. App.—Houston [1st Dist.] 2011, pet. dism'd). We acknowledge that an abuse-of-discretion review requires more of the appellate court than simply deciding that the trial court did not rule arbitrarily or capriciously. *Montalvo*, 315 S.W.3d at 593. An appellate court must instead measure the trial court's ruling against the relevant criteria by which the ruling was made. *Id.* It is not an abuse of discretion for the trial court merely to decide a matter within its discretion in a different manner than the appellate court would under similar circumstances. *Ex parte Miller*, 442 S.W.3d 478, 481 (Tex. App.—Dallas 2013, no pet.). The burden of proof is on the defendant who claims that his bail is excessive. *See Ex parte Rubac*, 611 S.W.2d at 849; *Montalvo*, 315 S.W.3d at 592.

**Excessive Bail**

In his appellant's brief, appellant argues that the trial court erred in denying him habeas relief, and reduction of his bond, (1) by finding that appellant "was a future danger to the community," and (2) because the $750,000 bond is "oppressive."

Before conviction, every citizen accused of a criminal offense has a "strong interest in liberty." *United States v. Salerno*, 481 U.S. 739, 750 (1987). Thus, the Eighth Amendment to the United States Constitution provides that "[e]xcessive bail

12

shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII; *see also Schilb v. Kuebel*, 404 U.S. 357, 365 (1971) (Eighth Amendment's prohibition of excessive bail applies to states). The Texas Constitution also guarantees that "[a]ll prisoners shall be bailable by sufficient sureties, unless for capital offenses, when the proof is evident." TEX. CONST. art. I, § 11; *see also id.* art. I, § 13 ("Excessive bail shall not be required . . . ."); TEX. CODE CRIM. PROC. ANN. art. 1.07 ("Any person shall be eligible for bail unless denial of bail is expressly permitted by the Texas Constitution or by other law.").

A defendant's right to pretrial bail, however, may be subordinated to the greater needs of society. *Salerno*, 481 U.S. at 750–51; *see also Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd) (noting "a balance must be struck between the defendant's presumption of innocence and the State's interest"). In balancing the liberty interest of a defendant and the safety interest of society, the Texas Legislature has adopted rules and guidelines for determining when a defendant should obtain pretrial release through the posting of adequate bail. *See* TEX. CODE CRIM. PROC. ANN. art. 17.01 ("'Bail' is the security given by the accused that he will appear and answer before the proper court the accusation brought against him . . . ."); *Ex parte Jefferson*, No. 07-20-00123-CR, 2020 WL 4249743, at *2 (Tex. App.—Amarillo July 23, 2020, no pet.) (mem. op., not designated for

publication). The primary purpose of pretrial bail is to secure a defendant's appearance at trial on the offenses with which he is charged. *See* TEX. CODE CRIM. PROC. ANN. art. 17.01; *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim. App. [Panel Op.] 1980); *Ex parte Vasquez*, 558 S.W.2d 477, 479 (Tex. Crim. App. 1977).

In exercising its discretion in setting the dollar amount of bail and any conditions of bail, a trial court must consider the following statutory factors:

1. Bail shall be sufficiently high to give reasonable assurance that a criminal defendant will appear at trial and comply with other court orders and conditions of the bond;

2. The power to require bail is not to be used as an instrument of oppression;

3. The nature of the offenses and the circumstances of their commission;

4. The ability to make bail is to be regarded, and proof may be taken on this point; and

5. The future safety of a victim of the alleged offenses and the community.

*See* TEX. CODE CRIM. PROC. ANN. art. 17.15; *see also Ludwig v. State*, 812 S.W.2d 323, 324 (Tex. Crim. App. 1991); *Golden v. State*, 288 S.W.3d 516, 518 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

In determining an appropriate amount of bail, the trial court may also consider a defendant's work record, his family and community ties, his residency, his prior criminal record, his conformity with previous bond conditions, and the aggravating

factors alleged to have been involved in the charged offenses. *See Ex parte Rubac*, 611 S.W.2d at 849–50; *Montalvo*, 315 S.W.3d at 593.

The burden of proof is on the defendant who claims that his bail is excessive. *See Ex parte Rubac*, 611 S.W.2d at 849; *Montalvo*, 315 S.W.3d at 592.

The trial court set appellant's bail at $750,000 for the felony offense of capital murder. In his appellant's brief, appellant specifically argues that the trial court erred in setting his bail at $750,000 and denying his request for habeas relief to reduce that bail amount, because (1) there was "insufficient evidence of danger to the community," and (2) the $750,000 bond amount is oppressive.

While appellant argues that the $750,000 bond set by the trial court is oppressive, we note that, in his pretrial application for writ of habeas corpus, appellant requested that "he be allowed bail in a reasonable amount," but does not state what a "reasonable amount" would be in this case. Further, at the hearing on appellant's pretrial application for writ of habeas corpus seeking a reduction in bond, the bulk of the testimony heard by the trial court was regarding appellant's eye condition and the efforts made by appellant, and his mother, to obtain access to his prescription contact lenses since he has been in custody.

We review the factors used by the trial court to set the amounts of appellant's bail to determine whether bail is excessive.

*Sufficiency of Bail*

The primary purpose of pretrial bail is to secure a defendant's appearance at trial on the offense with which he is charged. *See* TEX. CODE CRIM. PROC. ANN. art. 17.01; *Ex parte Rodriguez*, 595 S.W.2d at 550; *Ex parte Vasquez*, 558 S.W.2d at 479. One factor in considering whether a bail amount is reasonable is the potential sentence a criminal defendant is facing. *See Ex parte Rubac*, 611 S.W.2d at 849. Here, appellant is charged with capital murder, and faces a minimum sentence of life without the possibility of parole, with the State having the option to seek the death penalty. *See* TEX. PENAL CODE ANN. § 12.31(a). This potential sentence favors a high bail to avoid the potential of appellant fleeing. *See Ex parte Cardenas*, 557 S.W.3d 722, 731 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (affirming trial court's denial of application for writ of habeas corpus for reduction of $750,000 bond, reasoning that "[b]ecause Cardenas faces a significant potential sentence, possibly a life sentence, the trial court could have concluded that there is a possibility that Cardenas will not appear for trial and that bail should 'be sufficiently high to give reasonable assurance that' Cardenas will appear at trial").

Additionally, "[a] defendant's ties to the community and work history bear on the adequacy of the bail to give reasonable assurance he will appear." *Richardson v. State*, 181 S.W.3d 756, 759 (Tex. App.—Waco 2005, no pet.). Here, there is minimal evidence of appellant's ties to the community and work history. There was

16

no testimony at the hearing on appellant's habeas application discussing his work history or his ties to the community, other than his family residing in Houston and his need for prescription contact lenses. Appellant's mother did testify that, if appellant were released on bond pending trial, he could live in the family home.

At the June 9, 2022 bond hearing, there was testimony from appellant's father that, at the time of his arrest, appellant was employed as "a back-of-the-house worker" at Rooms To Go. Mr. Moreno testified that he believed appellant made "like, $16 an hour." However, there was no additional evidence regarding this, or any other, employment of appellant. We again note that the burden of proof is on the defendant who claims that his bail is excessive. *See Ex parte Rubac*, 611 S.W.2d at 849; *Montalvo*, 315 S.W.3d at 592.

The significant potential sentence faced by appellant, and the lack of evidence regarding his ties to the community or employment history, weighs against a determination that the bail amount set by the trial court was excessive. *See Richardson*, 181 S.W.3d at 759 ("A defendant's ties to the community and work history bear on the adequacy of bail to give reasonable assurance he will appear.").

### *Whether Bail is Being Used as an Instrument of Oppression*

Bail needs to be set in an amount that is sufficient to give reasonable assurance that a defendant will appear at trial for the offenses charged. *See Ex parte Dupuy*, 498 S.W.3d 220, 232 (Tex. App.—Houston [14th Dist.] 2016, no pet.). Yet, when

17

bail is set so high that a person cannot realistically pay for it, the trial court essentially "displaces the presumption of innocence and replaces it with a guaranteed trial appearance." *Id.* at 233 (internal quotations omitted). Bail may not be used as an instrument of oppression. *See Ex parte Guerra*, 383 S.W.3d 229, 233–34 (Tex. App.—San Antonio 2012, no pet.); *see also* TEX. CODE CRIM. PROC. ANN. art. 17.15(2). Bail set in a particular amount becomes oppressive when it assumes that the defendant cannot afford bail in that amount and when it is set for the express purpose of forcing the defendant to remain incarcerated. *See Ex parte Nimnicht*, 467 S.W.3d at 70; *Ex parte Durst*, 148 S.W.3d 496, 499 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (where bail amount set "solely to prevent [defendant] from getting out of jail," "bail [was] being used as an instrument of oppression").

To this end, in his brief, appellant argues that the trial court "[i]ntentionally set[] bail so high as to ensure that Mr. Moreno cannot pay it for the sole reason that Mr. Moreno has been charged with a violent crime," which, according to appellant, "violates the Excessive Bail Clause of both the federal and Texas constitutions." However, we must consider whether the record supports appellant's conclusory assertion, that the trial court made its decision regarding the bail amount "for the purpose of forcing [the defendant] to remain incarcerated pending trial." *Milner v. State*, 263 S.W.3d 146, 149 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Here, there is no evidence that the trial court set appellant's bail at $750,000, for the offense of capital murder which, as noted above, is punishable by incarceration for life without the possibility of parole, or death, for the sole purpose of keeping appellant incarcerated. *See Ex parte Anderson*, 2021 WL 499080, at *16–17; *Ex parte Dupuy*, 498 S.W.3d at 233; *Ex parte Nimnicht*, 467 S.W.3d at 70; *cf. Ex parte Harris*, 733 S.W.2d 712, 714 (Tex. App.—Austin 1987, no pet.) (trial court stated, "I'd rather see him in jail than to see someone's life taken").

We also note that the bail amount set by the trial court is akin to other cases involving a defendant charged with a first-degree felony offense, such as capital murder. *See Ex parte Dupuy*, 498 S.W.3d at 233 (review of bail set in other cases may be instructive); *see, e.g.*, *Ex parte Temple*, 595 S.W.3d 825, 830–31 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) ("While a $1,000,000 bond may be high, it is within the range of bail amounts that have been upheld for first-degree felony offenses including murder and capital murder."); *Ex parte Gonzalez*, 383 S.W.3d 160, 167 (Tex. App.—San Antonio 2012, pet. ref'd) (affirming $1,500,000 bond for capital murder); *Munoz v. State*, No. 01-08-00223-CR, 2009 WL 214505, at *5 (Tex. App.—Houston [1st Dist.] Jan. 29, 2009, no pet.) (mem. op., not designated for publication) (trial court did not err in setting bail amount at $1,000,000 for felony offense of capital murder); *Ex parte Brown*, No. 05-00-00655-CR, 2000 WL 964673, at *1 (Tex. App.—Dallas July 13, 2000, no

pet.) (not designated for publication) (affirming $1,000,000 bail for felony offense of capital murder).

Here, there is no evidence showing that the trial court used bail as an instrument of oppression. That lack of evidence weighs against a determination that the bail amount set by the trial court was excessive. *See Montalvo*, 315 S.W.3d at 596 ("[T]he habeas corpus record . . . does not suggest that the trial court deliberately set bail at an excessively high level solely to prevent [defendant] from posting bail.").

### *Nature and Circumstances of the Offenses*

The trial court must consider the nature and surrounding circumstances of the charges against appellant in setting the amount of bail. *See* TEX. CODE CRIM. PROC. ANN. art. 17.15(3); *Golden*, 288 S.W.3d at 518; *see also Ex parte Sells*, No. 02-20-00143-CR, 2020 WL 7639574, at *3 (Tex. App.—Fort Worth Dec. 23, 2020, no pet.) (mem. op., not designated for publication) (noting "bail is not set in a vacuum" and courts "must consider the nature and surrounding circumstances of the charges against" defendant); *Ex parte Nimnicht*, 467 S.W.3d at 67 ("When determining reasonable bail, a trial court shall give the most weight to the nature of the offense and the length of possible sentence."). When the nature of the offense is serious, as is the case here, "a lengthy prison sentence following trial is probable." *Ex parte Scott*, 122 S.W.3d 866, 869 (Tex. App.—Fort Worth 2003, no pet.).

20

"Pretrial bond in these kind[s] of cases should be set sufficiently high to secure the presence of the accused at trial because the accused's reaction to the prospect of a lengthy prison sentence might be not to appear." *Ex parte Hulin*, 31 S.W.3d 754, 761 (Tex. App.—Houston [1st Dist.] 2000, no pet.).

In his brief, appellant argues that the trial court abused its discretion in denying his requested habeas relief because there was only a "bare allegation of [a] crime of violence," and there were "no affirmative links to violence" on the part of appellant. However, appellant is charged with the felony offense of capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a)(2) (capital murder includes allegations that "person intentionally commits the murder in the course of committing or attempting to commit . . . robbery"), (b) (classifying capital murder as first-degree felony). If convicted, appellant faces a range of punishment from life imprisonment without the possibility of parole to the death penalty. *See* TEX. PENAL CODE ANN. § 12.31 (stating punishment range for capital offense).

The indictment alleges that appellant, on or about September 3, 2021, "unlawfully, while in the course of committing and attempting to commit the robbery of [complainant], intentionally caused the death of [complainant] by shooting [complainant] with a deadly weapon, namely a firearm." During the June 9, 2022 bond hearing, there was testimony regarding the nature of the incident which led to appellant being charged with capital murder. Detective Vera testified that, on

the night of the shooting, the complainant was selling drugs in the parking lot of a residential apartment complex. There was evidence that appellant and another individual went to the apartment complex intending to rob complainant, but a shootout ensued.

Detective Vera testified that upon arriving at the scene of the shooting, he noticed that "there was blood on the concrete of the parking lot and multiple shell casings." Specifically, Detective Vera testified that "over 30 shell casings," from a variety of calibers, were found at the scene. Detective Vera also testified that in a series of text messages between appellant and a female witness on the night of, and the day after, the shootout, appellant stated that complainant "had a 50 drum on a drac and an AR-15 and we had pistols," and that "[l]ike 50 shots was left off." Appellant later stated to the female witness that they "let six in him."

Appellant is charged with capital murder, a first-degree felony offense, and is accused of, in an attempt to commit a robbery of a drug dealer, engaging in a shootout in a residential apartment complex, in which between 30 and 50 shots were fired, and the complainant was killed after sustaining gunshot wounds to the lung and the spinal cord. The offense which appellant is charged with is both serious and violent in nature. *See Ex parte Payten*, 2013 WL 5968449, at *3–4 (considering nature and circumstances of offense to be violent where complainant was "shot in the face"); *Narvez v. State*, No. 01-08-00331-CR, 2009 WL 40263, at *3 (Tex.

22

App.—Houston [1st Dist.] Jan. 8, 2009, no pet.) (mem. op., not designated for publication) (shooting of complainant in neck with firearm constituted violent offense); *Hughes v. State*, 843 S.W.2d 236, 237 (Tex. App.—Houston [14th Dist.] 1992, no pet.) (first-degree felony offense of murder constitutes "a violent crime"); *see also Ex parte Garza*, No. 04-02-00803-CR, 2003 WL 21750013, at *1–2 (Tex. App.—San Antonio July 30, 2003, no pet.) (mem. op., not designated for publication) (murder of "unarmed victim who was repeatedly shot [in the back] as he tried to flee" was "brutal" offense); *Ex parte Saldana*, Nos. 13-01-360-CR, 13-01-361-CR, 2002 WL 91331, at *4 (Tex. App.—Corpus Christi–Edinburg Jan. 24, 2002, no pet.) (not designated for publication) (considering murder of complainants who "received two shots to the head" to be "brutal" offense).

"[W]hen considering the nature of the offense [charged] in setting [a defendant's] bail" amount, the trial court may also consider "the punishment permitted by law" for the offense with which the defendant is charged. *See Ex parte Vasquez*, 558 S.W.2d at 480; *see also Ex parte Ivey*, 594 S.W.2d 98, 99 (Tex. Crim. App. 1980); *Ex parte Nimnicht*, 467 S.W.3d at 67 ("When determining reasonable bail, a trial court shall give the most weight to the nature of the offense and the length of possible sentence."). Appellant is charged with the felony offense of capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a)(2). If convicted, appellant faces a range of punishment from life imprisonment without the possibility of parole to the

death penalty. *See* TEX. PENAL CODE ANN. § 12.31 (stating punishment range for capital offense). Simply stated, if appellant is found guilty of the offense of capital murder, he faces punishment of, at the very least, life in prison. *See O'Brien v. State*, No. 02-12-00176-CR, 2012 WL 2922545, at *5 (Tex. App.—Houston [1st Dist.] July 5, 2012, no pet.) (mem. op., not designated for publication) (possibility of substantial sentence supported setting of high bail amount).

The potential sentence appellant faces weighs against a determination that the bail amount set by the trial court was excessive. *See Ex parte Williams*, Nos. 12-18-00174-CR, 12-18-00175-CR, 2018 WL 5961309, at *2 (Tex. App.—Tyler Nov. 14, 2018, no pet.) (mem. op., not designated for publication) ("The . . . severe punishment ranges to which [defendant] may be subjected weighs in favor of the trial court's decision [to deny defendant's habeas application and] not to reduce the amount of his bonds.").

### *Future Safety of the Community*

The trial court must also consider the future safety of the community in setting appellant's bail amount. *See* TEX. CODE CRIM. PROC. ANN. art. 17.15(5); *Golden*, 288 S.W.3d at 518. We first note the seriousness of the first-degree felony offense with which appellant is charged. *See Milner v. State*, 263 S.W.3d 146, 151 (Tex. App.—Houston [1st Dist.] Dec. 14, 2006, no pet.) ("[T]he gravity and nature of the charges against [defendant] indicate that he presents a risk to the safety of the

community."); *see also Priel v. State*, No. 07-09-0349-CR, 2010 WL 445287, at *1–3 (Tex. App.—Amarillo Feb. 9, 2010, no pet.) (mem. op., not designated for publication) (given "the severity of the crime involved," appellate court could not conclude "that the trial court erred in refusing to reduce [defendant's] bail").

In his brief, appellant argues that "the evidence was not sufficient to support a finding that [appellant] is a future danger to the community." Appellant suggests that the "mere allegation that [appellant] is charged with capital murder is not sufficient to support an excessive bail amount because [appellant] is presumed innocent." The trial court noted that it was "fully aware that [appellant] . . . is presumed innocent and will continue to be presumed to be innocent unless and until the State proves the allegations against" him. Despite his presumption of innocence, a trial court must consider "the gravity and nature of the charges against" a defendant to determine whether "he presents a risk to the safety of the community." *See Milner*, 263 S.W.3d at 151.

The alleged offense here is serious and violent in nature. The shooting incident took place in the parking lot of a residential apartment complex as appellant purportedly attempted to rob the complainant, who was dealing drugs in the apartment parking lot. During the attempt to commit that robbery, a shootout ensued, where, according to Detective Vera, "over 30 shell casings," from a variety of calibers, were recovered. And, according to appellant, complainant "had a 50

25

drum on a drac and an AR-15 and we had pistols," and that "[l]ike 50 shots was left off." *See Ex parte Ragston*, 422 S.W.3d 904, 908 (Tex. App.—Houston [14th Dist.] 2014, no pet.) ("The violent nature of the offense demonstrates a potential risk to the community."); *see also Ex parte Bowman*, No. 14-17-00736-CR, 2017 WL 6545099, at *3 (Tex. App.—Houston [14th Dist.] Dec. 21, 2017, no pet.) (mem. op., not designated for publication) (same).

Here, the trial court could have reasonably found that appellant posed a danger to the community and the potential danger that appellant posed to the community weighs against a determination that the bail amount set by the trial court was excessive. *See Salerno*, 481 U.S. at 750–51 (defendant's right to pretrial bail may be subordinated to greater needs of society).

### *Ability to Make Bail*

Although the ability or inability to make bail does not control the amount of bail set, it is a factor that the trial court must consider in setting a defendant's bail amount. *See* TEX. CODE CRIM. PROC. ANN. art. 17.15(4); *Ex parte Rodriguez*, 595 S.W.2d at 550; *Golden*, 288 S.W.3d at 518–20. That said, a defendant's inability to pay the bail amount set by the trial court does not automatically render the amount excessive. *See Ex parte Vance*, 608 S.W.2d 681, 683 (Tex. Crim. App. 1980); *Ex parte Scott*, 122 S.W.3d 866, 870 (Tex. App.—Fort Worth 2003, no pet.). If the defendant's ability to make bail controlled the amount that the defendant paid, then

26

the trial court's role in setting the bail amount would be eliminated and the defendant would be in the position to determine the amount of bail. *Milner*, 263 S.W.3d at 150.

At the hearing on appellant's pretrial application for writ of habeas corpus, appellant's optometrist, Dr. Brian Cox, testified regarding his treatment of appellant for an "ophthalmic condition called anisometropia." Specifically, Dr. Cox testified regarding the medical necessity for appellant to have access to "contact lenses to minimize any double vision and provide the best optimal clarity." This testimony had no bearing on appellant's ability to make bail.

Also at the hearing on appellant's pretrial application for writ of habeas corpus, appellant's mother, Raquel Moreno, testified. Ms. Moreno testified regarding her unsuccessful efforts to get appellant his prescription contact lenses. Again, this testimony had no relevance to appellant's ability to make bail.

However, Ms. Moreno also testified regarding her efforts to pay appellant's bail. Ms. Moreno testified that she has "tried everything to bail [appellant] out." She testified that the family has "made several contacts" with a bondsman and sold a truck for approximately $20,000. Ms. Moreno and her husband have approximately $40,000 in equity in their home and discussed selling their home. However, Ms. Moreno testified that the bondsman told the Morenos that "even if [they] sell the house, [they] won't be able to bail [appellant] out because [they] don't

27

have any personal equity on anything else to back up the bail." According to Ms. Moreno, the bondsman stated to her and her husband that they "would need [$750,000] in collateral."

Ms. Moreno testified that her husband "is a manager at Rudy's Bar-B-Q," and that she "work[s] at Hobby Lobby" and has "been doing Uber Eats." She stated that there is no other way, or time, they could gain any extra income, and no other way they know of to change their financial status.

During the June 9, 2022 bond hearing, the trial court heard testimony from Marc Metze, the owner of Better Now Than Later Bail Bonds. Metze testified that he spoke with the Moreno family "about a bond for" appellant. At that time, Metze testified that, based on the state of the Morenos' financial condition, "the max amount" of bond the Morenos could afford would be $200,000. In connection with appellant's application for writ of habeas corpus, Metze submitted an affidavit which stated that he is "unable to secure the bond for" appellant, and that, to do so, he would "require $750,000 in collateral," which the "Morenos do not have." However, Metze further testified that "[i]f the bond is lowered to an amount for which the Morenos have sufficient collateral and are able to make the 10% down payment," he would "be able to secure the bond."

Notably, during the hearing on appellant's habeas application, appellant offered no evidence regarding his own financial situation. There was no testimony

28

from appellant regarding his employment history or the amount of bail he could pay, independently from his parents. The only evidence of appellant's financial condition was from the June 9, 2022 bond hearing, where appellant's father testified that prior to being taken into custody, appellant "was a back-of-the-house worker" at Rooms To Go. Mr. Moreno testified that he believed appellant made "like, $16 an hour." However, there was no additional evidence regarding this, or any other, employment of appellant. *See, e.g.*, *Lawhon v. State*, Nos. 03-15-00265-CR, 03-15-00277-CR, 03-15-00288-CR, 2015 WL 7424763, at *3 (Tex. App.—Austin Nov. 20, 2015, no pet.) (mem. op., not designated for publication) (noting defendant's mother's testimony that defendant was employed before being arrested provided some evidence that defendant "had at least some income"); *see also Ex parte Anderson*, 2021 WL 499080, at *15–16.

While there is some evidence regarding his family's financial condition and ability to pay his bond, the lack of evidence regarding appellant's ability, or inability, to make bail weighs against a determination that the bail amount set by the trial court was excessive *See Ex parte Anderson*, 2021 WL 499080, at *15–16 (trial court did not err in denying habeas relief where no "evidence about appellant's specific assets or financial resources . . . [or] what efforts, if any, were made by appellant to furnish bail in the amounts set by the trial court" was presented to trial court); *Ex parte Miller*, 631 S.W.2d 825, 827 (Tex. App.—Fort Worth 1982, pet. ref'd) ("[I]t [is]

29

incumbent on the accused . . . to show that he . . . made an effort to furnish bail in the amount set.").

Further, even if appellant is unable to pay the bail amount set by the trial court, this alone does not render the bail amount excessive, and given the lack of detail in the evidence presented about appellant's ability, or inability, to make bail, the trial court could have concluded that the bail amount was reasonable. *See Ex parte Anderson*, 2021 WL 499080, at \*16; *Awadalla v. State*, No. 02-18-00513-CR, 2019 WL 984860, at \*4 (Tex. App.—Fort Worth Feb. 28, 2019, pet. ref'd) (mem. op., not designated for publication) ("Although worth considering, inability to make bail does not control over the other factors."); *Ex parte Castillo-Lorente*, 420 S.W.3d 884, 889 (Tex. App.—Houston [14th Dist.] 2014, no pet.). The lack of evidence about appellant's purported inability to make bail weighs against a determination that the bail amount set by the trial court was excessive. *See Ex parte Rubac*, 611 S.W.2d at 849 (burden to establish bail is excessive lies with defendant); *Montalvo*, 315 S.W.3d at 592.

### *Other Factors*

Along with considering the factors set out in Texas Code of Criminal Procedure article 17.15, the trial court, when setting the bail amount, can also consider a defendant's work record, his family and community ties, his residency, his prior criminal record, his conformity with previous bond conditions, and the

aggravating factors alleged to have been involved in the charged offenses. *See Ex parte Rubac*, 611 S.W.2d at 849–50; *Montalvo*, 315 S.W.3d at 593. We have already discussed the nature and circumstances of the serious and violent first-degree felony offense, capital murder, with which appellant is charged.

In considering the other factors, we note that a defendant's ties to the community in which he lives can be an assurance that he will appear at trial for the offenses charged. *See Ex parte Nimnicht*, 467 S.W.3d at 68 (noting court's review of defendant's ties to community includes assessment of defendant's residence history, family ties to community, and work history). Appellant's father testified during the June 9, 2022 bond hearing, and his mother testified during the habeas hearing. Their testimony lays bare the care and affection appellant's parents hold for him. Their testimony also tends to establish their ties to the community. However, the record is absent of any evidence of appellant's ties to the community.

Further, there is minimal evidence in the record regarding appellant's work history. At the hearing on appellant's habeas application, there was no evidence presented to the trial court regarding appellant's work history. During the June 9, 2022 bond hearing, appellant's father briefly noted that, prior to his arrest, appellant had been employed as a "back-of-the-house" worker at Rooms To Go. However, Mr. Moreno did not provide any other information regarding that employment, or

any other employment appellant has held. Further, there was no other evidence offered regarding appellant's work history.

Notably, there is no evidence in the record to suggest that appellant had a prior criminal record. However, as noted by the State in its brief, capital murder, which appellant has been charged with, "is inherently an aggravated offense." And the fact that appellant did not have a prior criminal record, alone, is insufficient to show that the bail set by the trial court is excessive.

Appellant had the burden to show that the bail amount set by the trial court was excessive. *See Ex parte Rubac*, 611 S.W.2d at 849; *Montalvo*, 315 S.W.3d at 592. Given the balance of all the relevant factors discussed above,[4] we cannot conclude that the trial court erred by setting appellant's bail at $750,000 for the first-degree felony offense of capital murder. We hold that the trial court did not err in denying appellant's pretrial application for writ of habeas corpus.

We overrule appellant's issues.

### Conclusion

We affirm the order of the trial court.

---

[4]     *See* TEX. CODE CRIM. PROC. ANN. art. 17.15; *Ex parte Rubac*, 611 S.W.2d 848, 849–50 (Tex. Crim. App. 1981); *Montalvo v. State*, 315 S.W.3d 588, 592–93 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

Amparo Guerra
Justice

Panel consists of Justices Landau, Countiss, and Guerra.

Do not publish. TEX. R. APP. P. 47.2(b).