

# COURT OF APPEALS
# EIGHTH DISTRICT OF TEXAS
# EL PASO, TEXAS

---

## No. 08-26-00045-CR

---

### Ex Parte Dana Meador

---

**On Appeal from the 33rd District Court**
**Llano County, Texas**
**Trial Court No. 25-150-DCCV-23351**

---

## MEMORANDUM OPINION

Dana Meador appeals from the trial court's order denying relief on her pretrial application for a writ of habeas corpus seeking a reduction in her bond. Meador contends the trial court abused its discretion by denying her application. Finding no abuse of discretion, we affirm the trial court's order and dismiss as moot her motions for an expedited appeal.[1]

---

[1] This case was transferred pursuant to the Texas Supreme Court's docket equalization efforts. Tex. Gov't Code Ann. § 73.001. We follow the precedent of the Third Court of Appeals to the extent it might conflict with our own. *See* Tex. R. App. P. 41.3.

# I. FACTUAL AND PROCEDURAL BACKGROUND

Dana Meador was arrested and charged with first degree murder in the death of her mother, Glenna Platner Whitmarsh, and was confined to the Llano County jail. A complaint introduced at Meador's habeas hearing alleged that on September 12, 2025, Meador shot Whitmarsh in the head and drove to a residence in Horseshoe Bay, later identified as the family's vacation home, where she called her sister reporting that she had killed their mother, that she was contemplating killing herself, and that it was "best for the family." According to the complaint, officers responding to the scene found Whitmarsh deceased in the passenger seat of a vehicle parked in the home's garage. Meador informed the officers at the scene: "I just couldn't do it anymore. I couldn't take it. I couldn't put my family through it."

The trial court set Meador's bail at $750,000. Meador filed an "APPLICATION FOR A WRIT OF HABEAS CORPUS TO REDUCE BAIL," contending her bond was "excessive, oppressive and beyond the financial means of the Defendant, in violation of the Eighth and Fourteenth Amendments to the United States Constitution ("Excessive bail shall not be required), Article I, §§ 11, 13 and 19 of the Texas Constitution (same), and Articles 107, 1.09 and 17.15 of the Texas Code of Criminal Procedure." She sought a writ of habeas corpus to "show cause why bail should not be reduced to an amount sufficient to secure [her] appearance [in court]."

During the habeas hearing, Meador's attorney categorized the shooting as a tragic event that occurred while Meador was under "stress" due to the "dire" physical and mental condition of her mother, who suffered from the consequences of a broken hip, breast cancer, renal failure and dementia, and who had a life expectancy of less than six months. He argued Meador was unable to make bond in the amount imposed, was not a flight risk, had no prior criminal history, and posed no public safety concerns. The State argued the bond was appropriate, given the serious nature of

2

the charge; she did not have strong ties to the community; that she was a potential flight risk; and that there were safety concerns to the community.

### A. Sean Meador's testimony

Meador's only witness at the hearing was her adult son, Sean Meador.[2] Sean testified that his mother was 65 years old at the time of the hearing and had been widowed in 2003. He testified that Meador was a certified public accountant but had been winding down her practice at the time of the shooting, as she had been assisting Whitmarsh, his grandmother, with her declining health beginning in 2015. Sean believed Meador retained one client in Dallas.

Sean explained that Whitmarsh was widowed in either 1990 or 1991, but was "still viable and independent and able to be on her own" at that time, splitting time between her home in San Antonio and the family's vacation home in Horseshoe Bay, which was in his grandmother's name. He testified that in 2015, Whitmarsh fell and broke her hip and was later diagnosed with metastasized breast cancer and "stage 4 kidney failure." Following Whitmarsh's hip injury, he recalled, Meador stepped into a primary caregiver role, helping Whitmarsh with her "recovery [and] care," and also helping to "manage her estate and her finances, investments [and] helping her with maintaining her properties."

Sean reported that Whitmarsh suffered a second fall in May 2025 and broke her other hip, which led to a precipitous decline in her mental and physical health. Following surgery, Whitmarsh moved into a nursing home in Horseshoe Bay. He opined that although Whitmarsh had "some senility" symptoms prior to her second fall, he believed "her mental health was okay" before then; however, after her fall, there was a "decline in her mental health and she was showing signs of dementia." When he and his brother would visit her in the nursing home, "[s]he could still hold a

---

[2] Because Meador and her son share the same last name, we refer to her son by his first name.

conversation" and "was still social," but she was not always able to "follow along" with what was being said and was not always able to recall her prior visits with them. He estimated that at the time of her death, Whitmarsh had only six months to live.

According to Sean, Meador had been splitting her time between her home in Dallas and the family's Horseshoe Bay vacation home when she was attending to Whitmarsh, but in the weeks prior to her death, Meador was residing "full time" at the vacation home. He further recalled that during those weeks, Meador was seeking a guardianship of Whitmarsh and was under a "lot of anxiety and stress" from those proceedings. As part of the guardianship proceeding, Sean testified, Whitmarsh had been evaluated by Dr. Maureen Burrows from Austin, who determined she was "fully mentally incapacitated." On cross-examination, he acknowledged that a second evaluation had been conducted but denied knowing the results. He expressed his belief that Meador dismissed or nonsuited the guardianship proceeding upon Whitmarsh's death. Sean believed Whitmarsh left a disproportionate share of her estate to Meador due to the time and effort Meador devoted to her care. However, he believed that after Whitmarsh's death, Meador disclaimed any interest she had under the will.

Sean also testified that he and his brother had Meador's durable power of attorney and access to her bank accounts. Based on their review of her accounts, he expressed his opinion that Meador was financially unable to post a $750,000 bond. According to Sean, Meador had a total of $17,000 in her bank accounts and was receiving social security in the amount of $2,002. He testified that Meador had a certificate of deposit in the amount of $255,000 in her name but he believed "it could be contested as part of [the decedent's] estate," as it may have been a "gift" to Meador from Whitmarsh, and it was unclear if Meador could use the CD to obtain a bond. On cross-examination, Sean also acknowledged that during a recorded jail call with Meador, he told

4

Meador that he and his brother were hoping to use the CD for her legal expenses, but Meador said she believed it might be part of the decedent's estate. On cross-examination, he acknowledged that as of the date of the hearing, the CD was not "part of the estate." Sean further acknowledged that he believed Meador was "reluctant" to spend funds on her defense, as she had expressed concern over not being able to leave her sons anything when she passed.

During the recorded jail call, Sean said Meador informed him that she did not want to be released on bail because "she felt safe in jail, and she felt like it was a shell in a way from the outside world." Meador told Sean she thought she would have difficulty complying with some of the bond conditions but did not specify which ones. Sean nevertheless testified that if his mother was released from jail on bond, he believed she would comply with the conditions of her bond. He anticipated that she would return to her home in Dallas, and he averred that although he lived in Austin, he and his brother, who lived in Dallas, and his aunt, Meador's sister, who lived in Tyler, Texas, approximately two hours away, would ensure that she attended her court hearings.

### B. Herbert Allen Swank's testimony

Herbert Allen Swank, the State's only witness at the hearing, testified that he was an investigator with the Llano County Sheriff's Office and participated in the investigation of Whitmarsh's death. Swank testified, without objection, that during his investigation, he spoke with Whitmarsh's long-time friend and companion, Fred Macaskill. According to Swank, Macaskill informed him that prior to Whitmarsh's death, her relationship with Meador had become "troubled," and he believed "he needed to step in to help protect [Whitmarsh] because he felt that [Meador] was trying to take her money and was trying to kill her." Macaskill reported to Swank that he helped Whitmarsh send her financial records for a forensic analysis, which he believed "upset" Meador. Macaskill stated that Whitmarsh had informed him within a week before her death

5

that she "intended to change her will from the family to a nonprofit, a charity," He further testified that he learned Whitmarsh had been reevaluated during the guardianship proceedings the week before her death and had "scored pretty high," and that Meador was ready to nonsuit the case.

According to Swank, Macaskill reported that shortly before the decedent's death, Meador went to his residence, began "screaming at him," and threatened to "file a lawsuit" regarding either his "character" or "something to do with the guardianship case." He reported that he was "very scared," and "unsure of what she was willing and capable of doing."

Finally, Swank testified that during his investigation, upon searching Meador's Dallas home, he found "a pretty substantial amount of ammunition" and an empty "firearm box" but did not find any firearms. He acknowledged not knowing who else may have had access to the home.

## C. The trial court's ruling

After hearing the parties' arguments, the trial court stated that he was "really tempted to raise [Meador's bail] based on all of the factors," but decided "to leave it where it is." The court entered a written order dated December 19, 2025, denying Meador's application for writ of habeas corpus and leaving the bond at $750,000. By separate order, the court imposed several conditions on the bond, including requiring Meador to: participate in mental health and substance abuse treatment, be gainfully employed, wear a GPS monitor, and surrender her passport upon release. Meador appeals from the trial court's order denying the application.[3]

---

[3] As the State points out, Meador filed her notice of appeal on December 18, 2025, the day before the court entered its appealable order on December 19, 2025. *See Ex parte Gill*, 413 S.W.3d 425, 426 (Tex. Crim. App. 2013) (considering appeal from order denying pretrial application for writ of habeas corpus under Code of Criminal Procedure Article 17.151). The State, however, does not challenge our jurisdiction, and instead recognizes that "[p]ursuant to Tex. R. App. P. 27.1(b), the prematurely filed notice of appeal is effective and deemed filed on the same day as the trial court's appealable order." Meador's notice of appeal mistakenly stated that the date of the appealable order was October 31, 2025, the date that the trial court announced its ruling at the hearing. Because there is no confusion over the fact that Meador was attempting to appeal from the trial court's written order denying the pretrial habeas application, we treat it as a bona fide attempt to appeal from that order. *See Sanchez v. State*, No. 08-22-00161-CR, 2024 WL 378858, at *3 n.3 (Tex. App.—El Paso Jan. 31, 2024, no pet.) (mem. op., not designated for publication) (citing *City of San Antonio v. Rodriguez,* 828 S.W.2d 417, 418 (Tex. 1992) (recognizing that a court of appeals has

6

## II. APPLICABLE LAW AND STANDARD OF REVIEW

"'Bail' is the security given by the accused that he will appear and answer before the proper court the accusation brought against him, and includes a bail bond or a personal bond." Tex. Code Crim. Proc. art. 17.01. With certain exceptions not applicable here, the Texas Constitution guarantees that "[a]ll prisoners shall be bailable by sufficient sureties." Tex. Const. art. I, § 11; *see* Tex. Code Crim. Proc. art. 1.07. Both the federal and state constitutions prohibit excessive bail. U.S. Const. amend. VIII; Tex. Const. art. I, § 13; *see* Tex. Code Crim. Proc. art. 1.09. Bail is considered "excessive if set in an amount greater than is reasonably necessary to satisfy the government's legitimate interests." *Ex parte Beard*, 92 S.W.3d 566, 573 (Tex. App.—Austin 2002, pet. ref'd) (citing *United States v. Salerno,* 481 U.S. 739, 753–54 (1987) (construing Eighth Amendment); 41 Dix and Dawson §§ 16.11, .12 (discussing federal and state constitutional right to bail)).

"Determining the appropriate bail amount is a balancing act 'between the defendant's presumption of innocence and the State's interest in assuring the defendant's appearance at trial.'" *Ex parte Galvan*, No. 08-22-00229-CR, 2023 WL 2541358, at *2 (Tex. App.—El Paso Mar. 16, 2023, pet. ref'd) (citing *Ex parte Cardenas*, 557 S.W.3d 722, 730 (Tex. App.—Corpus Christi 2018, no pet.)). We engage in this balancing act by reviewing the factors set forth in § 17.15 of the Texas Code of Criminal Procedure, which provides:

> (a) The amount of bail and any conditions of bail to be required in any case in which the defendant has been arrested are to be regulated by the court, judge, magistrate, or officer taking the bail in accordance with Articles 17.20, 17.21, and 17.22 and are governed by the Constitution and the following rules:

---

jurisdiction over an appeal when the appellant files an instrument that is "a bona fide attempt to invoke appellate court jurisdiction")); *see also State v. Tabdili*, No. 15-24-00015-CV, 2025 WL 209445, at *2 (Tex. App. [15th Dist.] Jan. 16, 2025) (recognizing that "[a] timely filed instrument will invoke the appellate court's jurisdiction if it demonstrates a bona fide attempt to do so") (citing *Mitschke v. Borromeo*, 645 S.W.3d 251, 261 (Tex. 2022)).

1. Bail and any conditions of bail shall be sufficient to give reasonable assurance that the undertaking will be complied with.

2. The power to require bail is not to be used to make bail an instrument of oppression.

3. The nature of the offense and the circumstances under which it was committed are to be considered, including whether the offense:

   (A) is an offense involving violence as defined by Article 17.03; or
   (B) involves violence directed against a peace officer.

4. The ability to make bail shall be considered, and proof may be taken on this point.

5. The future safety of a victim of the alleged offense, law enforcement, and the community shall be considered.

6. The criminal history record information for the defendant . . . shall be considered, including any acts of family violence, other pending criminal charges, and any instances in which the defendant failed to appear in court following release on bail [and].

7. The citizenship status of the defendant shall be considered.

Tex. Code Crim. Proc. art. 17.15(a).

In addition to the statutory factors, "[o]ther relevant factors include the defendant's employment history, family ties, length of residency . . . previous bond compliance, other outstanding bonds, and aggravating facts of the charged offense." *Ex parte Gomez*, 624 S.W.3d 573, 576 (Tex. Crim. App. 2021) (citing *Ex parte Rubac*, 611 S.W.2d 848, 849–50 (Tex. Crim. App. [Panel Op.] 1981)); *see also Ex parte Galvan*, 2023 WL 2541358, at *2 (recognizing same); *Ex parte Reyes-Martinez*, 653 S.W.3d 273, 280 (Tex. App.—Austin 2022, no pet.) (same). In general, however, courts have recognized that "[t]he 'primary factors' to consider when evaluating the reasonableness of bail are the nature of the offense and the punishments that can be imposed for committing it." *Ex parte Reyes-Martinez*, 653 S.W.3d at 280 (citing *Rubac*, 611 S.W.2d at 849; *Ex parte Dupuy*, 498 S.W.3d 220, 230 (Tex. App.—Houston [14th Dist.] 2016, no pet.)); *see also Ex parte Galvan*, 2023 WL 2541358, at *2 ("The primary factors to be considered are the nature of the alleged offense and the length of the potential sentence"). The burden is on the defendant to

prove that bail is excessive in light of the above factors. *Ex parte Reyes-Martinez*, 653 S.W.3d at 280 (citing *Rubac*, 611 S.W.2d at 849; *Ex parte Benefield*, 403 S.W.3d 240, 242 (Tex. Crim. App. 2013) ("On appeal or in a habeas proceeding, the defendant has the burden to prove that bail is excessive.")); *see also Ex parte Galvan*, 2023 WL 2541358, at \*2 (recognizing same).

We review the trial court's ruling denying a habeas petition seeking a bail reduction for an abuse of discretion. *Ex parte Reyes-Martinez*, 653 S.W.3d at 280 (citing *Rubac*, 611 S.W.2d at 850; *Ex parte Gill*, 413 S.W.3d 425, 428 (Tex. Crim. App. 2013) (stating that "the decision of a trial judge at a habeas proceeding regarding the imposition or reduction of bail 'will not be disturbed by this Court in the absence of an abuse of discretion'")); *Ex parte Galvan*, 2023 WL 2541358, at \*1 ("We review a trial court's pretrial bail determination under an abuse of discretion standard."). We do not substitute our judgment for that of the trial court. Instead, we will not disturb the trial court's ruling if it was within the zone of reasonable disagreement. *Ex parte Reyes-Martinez*, 653 S.W.3d at 280 (citing *Ex parte Brooks*, 376 S.W.3d 222, 225 (Tex. App.—Fort Worth 2012, pet. ref'd) ("To determine whether the trial court abused its discretion [in ruling on a request to reduce bail], we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable.")).

In making our determination, we view the record and evidence in the light most favorable to the trial court's ruling. *Id.* (citing *Kniatt v. State*, 206 S.W.3d 657, 664 (Tex. Crim. App. 2006)). "The trial court is the exclusive judge of witness credibility, and we afford it 'considerable discretion in making those challenging determinations.'" *Id.* (citing *Ex parte Everage*, No. 03-17-00879-CR, 2018 WL 1788795, at \*9 (Tex. App.—Austin Apr. 13, 2018, no pet.) (mem. op., not designated for publication) (observing that bail cases involve "the difficult task of weighing the specific facts of a case against many, often contravening factors, and often in the face of scant

9

evidence")); *see generally Ex parte Mowbray*, 943 S.W.2d 461, 465 (Tex. Crim. App. 1996) (en banc) (recognizing that in a habeas proceeding, "the judge determines the credibility of the witnesses and if the habeas judge's findings of fact are supported by the record, they should be accepted by this Court").

## III. Discussion

### A. The nature and circumstances of the offense

Here, Meador is charged with the felony offense of murder. *Ex parte Bartolo*, No. 01-22-00544-CR, 2022 WL 17254957, at *4 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. ref'd) (mem. op., not designated for publication) (citing *Ex parte Walker*, No. 07-22-00048-CR, 2022 WL 2176306, at *3 (Tex. App.—Amarillo June 16, 2022, no pet.) (mem. op., not designated for publication) ("Murder is unquestionably a serious offense.")). In her brief, Meador attempts to downplay the serious nature of the offense by arguing that she shot her mother as an act of "mercy" due to her mother's "short life expectancy and her rapidly diminishing physical and mental conditions." And, she asserts, she was under a "great deal of stress and fatigue" at the time. She points out that she did not flee and instead immediately turned herself in.

The State points out that the complaint filed against Meador indicates the murder was committed in a violent manner, with Meador shooting her mother in the head while she was a passenger in her vehicle. In addition, Swank provided unobjected-to testimony to suggest that Meador may have had a financial motive for the shooting, based on Whitmarsh's decision to change her will, and that the shooting may have been premediated given the ammunition found in her home. While Meador's motive and mental state are subject to dispute at trial, at this point, the trial court was free to determine that there was sufficient evidence that the crime was of a violent and premeditated nature.

When considering the "nature and circumstances" of the case, courts have recognized that these considerations "implicate the range of punishment." *Ex parte Reyes-Martinez*, 653 S.W.3d at 280 (citing *Ex parte Gomez*, 624 S.W.3d 573, 576 (Tex. Crim. App. 2021)); *see also Ex parte Galvan*, 2023 WL 2541358, at *2 (recognizing same); *Ex parte Rodriguez*, 595 S.W.2d 549, 550 (Tex. Crim. App. 1980) ("Taking into consideration the 'nature of the offense' necessarily involves the punishment permitted under the law."). Here, Meador faces a maximum punishment of 99 years or life in prison. *See* Tex. Penal Code Ann. §§ 12.32(a), 19.02(b), (c). "With the prospect of a lengthy prison sentence, the importance of setting bail sufficiently high to secure [a defendant's] appearance at trial is heightened." *Ex parte Rotter*, No. 02-21-00016-CR, 2021 WL 2006313, at *3 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op., not designated for publication) (citing *In re Hulin*, 31 S.W.3d 754, 761 (Tex. App.—Houston [1st Dist.] 2000, no pet.)).

Accordingly, the facts submitted at the hearing regarding the circumstances of the offense and the range of punishment Meador faces should she be found guilty support the ruling.

### B. The safety of the community

Meador also argues there was no evidence to suggest that she posed a danger to the community or to her family. She points out that her son testified at the hearing that her family was supportive of her and did not fear for their safety.

The State points out, however, that the trial court heard evidence—again in the form of Swank's unobjected-to testimony—that Swank found a substantial amount of ammunition in Meador's home as well as an empty firearm box. Swank also testified that Meador had a threatening encounter with Macaskill in the days prior to the shooting. While Meador points out

that she did not threaten physical harm, Swank testified that her conduct caused Macaskill to become "very scared" of her and was uncertain as to what she might do.[4]

As the State also points out, the evidence submitted at the hearing indicated that Meador informed the officers at the scene of the offense that she was suicidal, which could have prompted the trial court to believe that she posed a danger not only to herself, but the community at large. *See Ex parte Garner*, No. 10-18-00129-CR, 2018 WL 3469834, at *4 (Tex. App.—Waco July 18, 2018, no pet.) (mem. op., not designated for publication) (noting testimony that defendant's "threats of suicide rendered her a flight risk and a danger to the community").

We therefore conclude that this factor supports the trial court's ruling.

### C. Ties to the community and risk of flight

Meador contends that her son's testimony supports a finding that she had significant ties to the community and to her family, and that she was not a flight risk. She calls attention to her son's testimony that despite the distance between Meador's Dallas home and Llano County, her family would ensure she would be able to attend all of her court hearings in Llano County.

As the State notes, the trial court could have again taken into consideration Meador's suicidal ideations in determining that any family or other ties Meador had in the community might have been of diminished significance. As various courts have recognized, the "strength attributable to [a defendant's] family ties in the area . . . [is] weakened by evidence of his struggles with suicidal ideations." *Ex parte Kienlen*, No. 02-22-00154-CR, 2022 WL 15053326, at *9 (Tex. App.—Fort Worth Oct. 27, 2022, no pet.) (mem. op., not designated for publication) (citing *Ex parte Hammond*, No. 02-21-00020-CR, 2021 WL 2373467, at *4 (Tex. App.—Fort Worth June 10, 2021,

---

[4] Meador's attorney suggested that this concern could be addressed by imposing a bond condition prohibiting Meador from having any contact with Macaskill. It was within the trial court's discretion to determine if this condition would be sufficient to ensure that Meador would not pose a threat to either Macaskill or the public at large.

no pet.) (mem. op., not designated for publication); *Rotter*, 2021 WL 2006313, at *3–4 (noting that the trial court could have found that defendant's suicide attempts minimized the importance of defendant's family ties); *Clemons v. State*, 220 S.W.3d 176, 179 (Tex. App.—Eastland 2007, no pet.) (construing suicidal thoughts as evidence of an "apparent lack of regard for his community ties")).

Moreover, the evidence suggested that although Meador had worked as a CPA in Dallas, she was winding down her practice. She offered no details regarding what type of employment, if any, she would be able to obtain if released on bond. This factor bodes against finding that she had community ties that would limit the risk of flight or provide an incentive for her to remain in the jurisdiction. *See Ex parte Hopkins*, Nos. 03-19-00695-CR, 03-19-00715-CR, 2020 WL 4929775, at *4 (Tex. App.—Austin Aug. 20, 2020, no pet.) (mem. op, not designated for publication) (finding that appellant failed to establish that he had community ties and was not a flight risk where he "offered some evidence of his employment history, [but] no evidence of continuing work—that is, that his previous employment would be available to him should he bond out").

The trial court could have reasonably concluded from these factors that Meador's ties to the community were insufficient to warrant a bond reduction.

### D. Compliance with the conditions of bond

Meador next contends the record supports a finding that she would comply with the conditions of her bond if she were able to secure her release, again pointing to her son's testimony that he and the family would assist her. Imposing additional bond conditions, she argues, such as requiring a GPS monitoring device, would "ensure [she] will not flee."

But in Meador's phone conversation with her son, she was concerned she would have difficulty complying with the bond conditions. Although Meador did not specify the conditions

13

with which she might have difficulty, the trial court could have determined that Meador's own doubts weighed against finding that she would be able to fulfill her bond conditions.

In addition, as set forth above, the trial court required Meador to be gainfully employed upon her release, but she presented little, if any evidence, of her ability to do so, particularly in light of her son's testimony that she had been winding down her CPA practice and may have had only one client at the time of the hearing. Accordingly, the trial court could have concluded that this factor also weighed against a bail reduction.

### E. Ability to make bail

Meador contends that the undisputed evidence established her financial inability to post a $750,000 bond, i.e., that she did not have $75,000 to pay the 10% fee that a bail bondsman would charge for posting her bond. We have two issues with this argument.

First, although the ability of a defendant to post bail is a factor to be considered, standing alone, "the inability to make the bail set does not automatically render the bail excessive." *Ex parte Hopkins*, 2020 WL 4929775, at *3 (citing *Lawhon v. State*, No. 03-15-00265-CR, 2015 WL 7424763, at *2 (Tex. App.—Austin Nov. 20, 2015, no pet.) (mem. op., not designated for publication); *Ex parte Vance*, 608 S.W.2d 681, 683 (Tex. Crim. App. 1980) ("It is established that the ability or inability of an accused to make bail does not alone control in determining the amount of bail.")).

Second, as the Austin Court of Appeals had recognized, to demonstrate an inability to make bond, a defendant must generally establish that not only are her funds exhausted, but that her family's funds have also been exhausted. *Ex Parte Reyes-Martinez*, 653 S.W.3d at 280 ("[t]o show that he is unable to make bail, a defendant must show that his funds and his family's funds have been exhausted" (quoting *Milner v. State*, 263 S.W.3d 146, 149 (Tex. App.—Houston [1st Dist.]

14

2006, no pet.)); *see also Ex parte Galang*, No. 05-25-01012-CR, 2025 WL 3089984, at *3 (Tex. App.—Dallas Nov. 4, 2025, no pet.) (mem. op., not designated for publication) (recognizing same) (citing *Ex parte Dueitt*, 529 S.W.2d 531, 532–33 (Tex. Crim. App. 1975) (concluding bail set was excessive where the evidence showed that appellant's and his family's funds were exhausted in obtaining his release on the original bail amount)). Here, Meador did not establish that her funds or her family's funds were exhausted.

Meador's son testified that she only had $17,000 in her bank accounts and received a social security check of only $2,002 a month, but he also testified that she had a $255,000 CD in her name. Although Meador argues that the evidence at trial established that she did not have access to the CD while Whitmarsh's estate was pending, the evidence presented at the hearing was conflicting on that issue. In addition, the undisputed evidence established that Meador owned a home in Dallas, and she neither presented evidence regarding the home's value or evidence that she could not use her home as collateral for obtaining a bond. While Meador's son testified that she still had one client in the Dallas area, no one provided any evidence regarding the amount of income, if any, she received from that client.

Meador provided no evidence that her family was unable to assist her with posting the bond. Her son testified that both he and his brother were gainfully employed, and he presented no testimony to establish that they or other family members would be unable to assist their mother in obtaining a bond.[5]

Sean did not testify to any efforts Meador or her family made to obtain a bond prior to the hearing. As the Austin Court of Appeals has recognized, unless a defendant is able to demonstrate

---

[5] Sean Meador testified that he was employed as a software engineer and that his brother is an executive at a real estate company working in finance. He did not, however, provide any details regarding their income or their ability to assist their mother with obtaining a bond.

that she has exhausted her and her family's resources, she must "usually show that [she] made an unsuccessful effort to furnish bail before bail can be determined to be excessive." *Ex parte Reyes-Martinez*, 653 S.W.3d at 281 (citing *Milner*, 263 S.W.3d at 149); *see also Ex parte Ramirez-Hernandez*, 642 S.W.3d 907, 920 (Tex. App.—San Antonio 2022, no pet.) ("A defendant should ordinarily offer evidence of his available resources and his unsuccessful attempts to post bail in the current amount.").

Accordingly, on the record before it, the trial court could have properly concluded that Meador's evidence regarding her financial circumstances was inadequate to suggest that she could not post a bond in the amount set, such as to render the bond amount unreasonable. *See Ex parte Hopkins*, 2020 WL 4929775, at *3 (recognizing that "a bail reduction is not favored when the defendant makes vague references to inability to make bail without detailing his specific assets and financial resources").

### F. Whether the record shows the bond was used as "an instrument of oppression"

Finally, Meador contends the bond amount served as an instrument of oppression, rather than an instrument to secure her presence at trial. Meador maintains there are a plethora of cases in which courts have found that a bond of less than $750,000 was sufficient to secure the defendant's presence in both capital murder and murder cases. Among those she primarily relies on the Texas Court of Criminal Appeals' opinion in *Ludwig*, in which the court held that a $1 million bail was excessive in a capital murder prosecution. *Ludwig v. State*, 812 S.W.2d 323, 324 (Tex. Crim. App. 1991) (en banc). She points out that in *Ludwig*, the Texas Court of Criminal Appeals recognized that it had "yet to condone a bail amount even approaching seven figures, even in a capital case." *Id*. (citing *Ex parte Vasquez*, 558 S.W.2d 477 (Tex. Crim. App. 1977); *Ex parte Bufkin*, 553 S.W.2d 116 (Tex. Crim. App. 1977)).

The State points out, though, that *Ludwig* was decided 35 years ago, and due to the "changing value of money" over the decades, Meador's reliance on *Ludwig* and other cases of that era are unhelpful in determining whether a bond amount is oppressive or unreasonable, as they are "too old to provide useful dollar-to-dollar comparisons." *See Ex Parte Dupuy*, 498 S.W.3d at 233 (rejecting defendant's reliance on *Ludwig* and other cases of that era in arguing that his bond was set unreasonably high, as such cases were "too old to provide useful dollar-to-dollar comparisons due to the changing value of money").

Since *Ludwig* was decided, numerous courts have recognized that a trial court does not abuse its discretion in setting bail at $750,000 or more in both murder and capital murder cases depending on the circumstances of a particular case. *See, e.g.*, *Ex parte Rotter*, 2021 WL 2006313, at *5 (recognizing that "this court and others have affirmed bail amounts set at $750,000 or higher in cases of murder or other serious first-degree felonies (citing *Ex Parte Green*, No. 02-13-00474-CR, 2014 WL 584960, at *2–3 (Tex. App.—Fort Worth Feb. 13, 2014, no pet.) (mem. op., not designated for publication) (affirming a $1 million bail in a murder case, and collecting similar cases of bail set in similar amounts in connection with murder charges))); *see also Ex parte Temple*, 595 S.W.3d 825, 830–31 (Tex. App.—Houston [14th Dist.] 2019, pet. ref'd) (recognizing that although a $1 million bond may be high, it is within the range of bail amounts that have been upheld for first-degree felony offenses including murder and capital murder) (citing *Ex parte Gonzalez*, 383 S.W.3d 160, 167 (Tex. App.—San Antonio 2012, pet. ref'd) (affirming $1.5 million bond for capital murder); *Ex parte Saldana*, Nos. 13-01-360-CR, 13-01-361-CR, 2002 WL 91331, at *6 (Tex. App.—Corpus Christi Jan. 24, 2002, no pet.) (not designated for publication) (affirming $1 million bond for capital murder); *Ex parte Brown*, No. 05-00-00655-CR, 2000 WL 964673, at *2 (Tex. App.—Dallas July 13, 2000, no pet.) (not designated for publication) (affirming

$1 million bond for capital murder)); *Ex parte Cardenas*, 557 S.W.3d at 732 (finding $750,000 bond was not excessive in capital murder case, recognizing that "courts of appeals, including this Court, have upheld pretrial bonds as high as a million dollars and more for defendants facing capital murder charges"); *Ex parte Bellanger*, No. 12-09-00246-CR, 2009 WL 4981457, at *3 (Tex. App.—Tyler Dec. 23, 2009, no pet.) (mem. op., not designated for publication) (recognizing that bail amounts in excess of one $1 million have been upheld by Texas courts in murder cases). This Court recently held that a trial court did not abuse its discretion in refusing to lower a bond set in the amount of $850,000 in a murder case—even though the defendant presented evidence that he could not post a bond in that amount—given the violent nature of the offense and the potential life sentence the defendant faced if convicted. *See Ex parte Galvan*, 2023 WL 2541358, at *3 (citing *Ex parte Lucas*, No. 06-20-00127-CR, 2021 WL 1181202, at *1 (Tex. App.— Texarkana March 30, 2021, no pet.) (mem. op., not designated for publication) (holding the trial court did not abuse its discretion in refusing to reduce a $1 million bond in a first-degree murder case); *Ex parte Murray*, Nos. 02-13-00151-CR, 02-13-00152-CR, 02-13-00153-CR, 2013 WL 5425312, at *1 (Tex. App.—Fort Worth Sept. 26, 2013, no pet.) (mem. op., not designated for publication) (per curiam) (holding the trial court did not abuse its discretion in refusing to reduce a $750,000 bond in an aggravated assault with a deadly weapon case)).

Although Meador relies on the Austin Court of Appeals holding in *Ex parte Beard*, 92 S.W.3d 566 (Tex. App.—Austin 2002, pet. ref'd), in which the court reduced the defendant's bail from $8 million to $500,000 in a capital murder case, we do not find *Beard* helpful to her case. In that case, the court recognized that "[c]ase law is of relatively little value in addressing the ultimate question of the appropriate amount of bail in a particular case" because appellate decisions on bail matters are often brief and avoid extended discussions and because the "cases are so individualized

18

that generalization from results reached in others is difficult." *Id.* at 571. However, the court found it instructive to review "some recent capital murder bail cases," including the Court of Criminal Appeals' holding in *Ludwig* in 1991 and continuing through a more recent case in 2002. *Id*. at 571–72. The court noted that it found no case in which bail had been set in the range of $8 million, and it therefore determined that an $8 million bail setting was excessive, as it was "more than eight times higher than the highest bail previously determined to be reasonable in a reported Texas capital murder case," and that "[s]uch a dramatic departure from prior practice is at least suggestive of an abuse of discretion." *Id*. at 573. After analyzing the various statutory factors set forth above, the court determined that a reasonable bail amount would be $500,000. *Id.* at 573–74.

The court's decision to reduce the bond to $500,000 in *Beard* does not guide an upper limit of the amount of appropriate bail for murder cases. To the contrary, the Austin Court expressly recognized in *Beard* that the question of whether a bond is excessive must be decided on a case-by-case basis, given the "individualized" nature of determining bail. *Id*. at 571. Even the court in *Beard*, which was decided 24 years ago, recognized that the San Antonio Court of Appeals had upheld bail that was set at $750,000 in a murder case in 1997. *Id*. at 572 (citing *Ex parte Chavfull*, 945 S.W.2d 183, 186–87 (Tex. App.—San Antonio 1997, no pet.) (holding $750,000 bail not excessive for a defendant charged with murdering individual with firearm given violent nature of crime)). We have found no recent Austin Court of Appeals cases holding that a bond in that amount can be considered excessive, particularly when, as here, the facts demonstrate that the crime was committed in a violent manner.

Nothing in the record suggests the trial court declined to reduce Meador's bond with the intent to use the bond to be an instrument of oppression. As the Austin Court of Appeals has recognized, this may occur when the trial court makes comments on the record that it is refusing

to reduce the bail amount "for the express purpose of forcing [the] appellant to remain incarcerated" pending trial. *See Ex parte Moore*, No. 03-12-00259-CR, 2012 WL 2078257, at *6 (Tex. App.—Austin June 8, 2012, no pet.) (mem. op., not designated for publication) (citing *Ex parte Harris*, 733 S.W.2d 712, 714 (Tex. App.—Austin 1987, no writ) (per curiam) (appeals court found abuse of discretion where trial judge stated, "I'd rather see him in jail than to see someone's life taken . . .")); *see also Ex parte Hopkins*, 2020 WL 4929775, at *4 (recognizing same). Our review of the record reveals no such comments from the trial court, and we will not infer otherwise on a silent record. *Ex parte Moore*, 2012 WL 2078257, at *6 (citing *Milner*, 263 S.W.3d at 149; *Ex parte Davis*, 147 S.W.3d 546, 549 (Tex. App.—Waco 2004, no pet.)); *see also Ex parte Temple*, 595 S.W.3d at 830 (concluding that there was no evidence on the record that bail in the amount of $1 million was being used as an instrument of oppression); *Ex parte Ramirez-Hernandez*, 642 S.W.3d at 920 (affirming a $1 million bail amount, after recognizing that the record did "not reveal any comment or suggestion by the trial court indicating it refused to reduce [the defendant's] bail for the express purpose of forcing him to remain in jail pending trial" (citing *Montalvo v. State*, 315 S.W.3d 588, 596 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (appellate court's independent review of habeas corpus record "[did] not suggest that the trial court deliberately set bail at an excessively high level solely to prevent [the defendant] from posting bail"))). To the contrary, the court in Meador's case expressed its opinion that it believed an even higher bond would have been appropriate under the circumstances but decided to leave the bond in the amount previously set.

We therefore do not find that the $750,000 bond was "an instrument of oppression" under these circumstances.

## G.  Other factors

Meador contends there are other factors in the record to support a finding that she was entitled to a bond reduction. Meador points to the fact that she has no criminal history, no history of other bond settings or of evading bonds in the past, she has a lengthy work history as a CPA, and she has longtime community and family ties in both Dallas and Llano County. She further contends that there were no aggravating factors involved in the offense.[6]

While the trial court was certainly entitled to consider these factors in determining whether to reduce Meador's bond amount, it was nevertheless within the trial court's discretion to determine that these factors were not significant enough to ensure Meador's compliance with her bond conditions and to secure her presence in court absent a bond in the previously-set amount. *See, e.g.*, *Ex parte Pace*, No. 03-20-00430-CR, 2021 WL 728168, at *3–6 (Tex. App.—Austin Feb. 25, 2021, no pet.) (mem. op., not designated for publication) (trial court had the discretion to determine that the defendant's work history and family ties did not offer a "meaningful incentive for [him] to remain in the area pending his trial").

## H.  The trial court did not abuse its discretion

Upon applying all of the above factors, and viewing the record evidence in the light most favorable to the trial court's ruling, as we must, we conclude that the trial court did not abuse its discretion in denying Meador's request for a bond reduction. The record demonstrates that the offense itself was of a violent nature and Meador faces a life sentence if convicted. There is evidence raising concerns that Meador poses a danger to herself and the community, as well as a potential flight risk, and that she might be unable to comply with the conditions of her bond. There is nothing in the record to suggest that the $750,000 bond setting was excessive under these

---

[6] We presume that Meador is referring to the aggravating factors that raise a charge of murder to capital murder. *See* Tex. Penal Code Ann. § 19.03. We acknowledge that Meador has not been charged with any such aggravating factors.

circumstances, nor did Meador present sufficient evidence to establish that she could not afford to obtain a bond in that amount. Although we acknowledge that other factors in the record might weigh in favor of a lower bond setting, overall, these factors collectively do not support a finding that a bond setting in that amount was excessive or unreasonable on the record before us.

We therefore conclude that Meador did not meet her burden of establishing that the trial court abused its discretion in refusing to reduce her bond amount.

Meador's sole issue on appeal is overruled.

## IV. CONCLUSION

We affirm the trial court's order denying habeas relief. In light of our ruling, we dismiss as moot Meador's two pending motions for an expedited appeal.

LISA J. SOTO, Justice

April 28, 2026

Before Salas Mendoza, C.J., Palafox, and Soto, JJ.

(Do Not Publish)